

FILED

JUN 1 0 2013

U.S. COURT OF
FEDERAL CLAIMS

## UNITED STATES COURT OF FEDERAL CLAIMS

WASHINGTON FEDERAL, MICHAEL
McCREDY BAKER, and CITY OF AUSTIN
POLICE RETIREMENT SYSTEM, on behalf
of themselves and all others similarly situated,

      Plaintiffs,

      v.

THE UNITED STATES OF AMERICA,

      Defendant.

No.    **13-385 C**

COMPLAINT

ORIGINAL

## TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ....................................................................................1

II.     PARTIES ...............................................................................................................8

III.    JURISDICTION AND VENUE ..............................................................................9

IV.     CONSTITUTIONAL PROVISION ........................................................................9

V.      FACTUAL BACKGROUND ..................................................................................9

        A.      History of Fannie Mae and Freddie Mac ....................................................9

                1.      Creation of Fannie Mae and Freddie Mac. ......................................9

                2.      The Success of Fannie Mae and Freddie Mac With Investors...................12

                3.      The Housing and Community Development Act of 1992 and the
                        Government's Confidence in the Financial Health of the Companies ......14

        B.      Freddie Mac and Fannie Mae Troubles Had Never Previously Warranted
                Conservatorship ........................................................................................16

        C.      The Government's Actions Weakened the Companies' Financial Strength By
                Requiring Them to Increase Their Holdings in Riskier Mortgages and
                Mortgage-Backed Instruments ...................................................................17

        D.      The Housing and Economic Recovery Act of 2008 and the Government's
                Continued Expressions of Confidence in the Companies and Their Financial
                Strength ....................................................................................................19

        E.      Fannie Mae and Freddie Mac Are Improperly Placed in Conservatorship ..........23

                1.      Government Actions Leading to Imposition of the Conservatorship ........23

                        a.      The Government dramatically changed capital requirements to
                                make the Companies appear unsound. ............................................23

                        b.      The Government's conservatorship plan was hatched in
                                secrecy and gave the Companies no choice but to accept
                                Government control. ....................................................................23

                        c.      The Government's motive for imposing the conservatorships was
                                to maintain liquidity in the U.S. mortgage market, in part, by
                                bailing out other financial institutions holding high-risk
                                mortgages and mortgage-backed instruments. ................................26

                        d.      The conservatorships obliterated shareholder value. .....................28

010347-11 615631V1

2. The Government Bullied and Coerced the Companies' Boards of Directors Into Consenting to the Conservatorships, Thus Rendering Their Consent Invalid. .............................................................................29

3. None of the Criteria Under HERA for Appointing a Conservator Was Properly Satisfied ..............................................................................31

a. The Companies' assets were significantly greater than their liabilities..............................................................................32

b. The Companies had not suffered a substantial dissipation of assets or earnings due to a violation of law or unsafe and unsound practices...................................................................33

c. Neither company was in an unsafe or unsound condition. ............34

d. Neither company was in violation of any cease and desist order. .36

e. Neither company concealed or refused to submit any books or records.......................................................................................37

f. The Companies were able to pay their obligations and meet the demands of their creditors...................................................37

g. Neither company incurred or was likely to incur losses that would deplete all or substantially all of its capital........................38

h. Neither company violated any law or regulation, or engaged in any unsafe or unsound practice or condition that would likely cause insolvency, a substantial dissipation of assets or earnings, or a weakening of its condition. ....................................40

i. The Companies did not consent to the appointment of a conservator. ...........................................................................40

j. Neither company was undercapitalized. ........................................41

k. Neither company was critically undercapitalized. .........................43

l. Neither company was found guilty of money laundering.............43

F. The Stock Agreements Improperly Appropriated the Private Property of the Companies' Preferred and Common Shareholders.................................................44

1. The Original Stock Agreements....................................................................44

2. The Third Amendment..................................................................................47

VI. THE GOVERNMENT'S CONDUCT CONSTITUTED AN ILLEGAL EXACTION AND/OR TAKING WITHOUT JUST COMPENSATION IN VIOLATION OF THE U.S. CONSTITUTION ..........................................................................................50

010347-11 615631V1

A. The Government Disregarded the Rights and Property Interests of the Companies' Shareholders in Taking Control of the Companies, Saddling Them With the Oppressive Stock Agreements, and Dissipating Their Assets to Achieve Its Public Policy Objectives...................................................................50

    1. Plaintiffs Had a Property Interest in the Economic Value Associated with Their Shares of Fannie Mae and Freddie Mac Common and Preferred Stock..................................................................................51

    2. Plaintiffs had a Reasonable Investment-backed Expectation that the Government Would Not Appropriate Shareholder Value and Rights in the Companies...........................................................................53

B. The Government's Conduct During the Conservatorship Dissipated the Assets of the Companies and Constituted a Taking...............................................56

C. The August 2012 Amendment to the Stock Agreements Constituted a Taking of Private Property....................................................................................57

D. The Companies' Shareholders Have Lost Billions of Dollars as a Result of This Misconduct .........................................................................................58

VII. CLASS ALLEGATIONS ....................................................................................59

VIII. CLAIMS FOR RELIEF .......................................................................................61

COUNT ONE (ILLEGAL TAKING AND/OR EXACTION IN VIOLATION OF THE UNITED STATES CONSTITUTION) ..........................................................................61

PRAYER FOR RELIEF ...........................................................................................63

010347-11 615631V1

## I.   NATURE OF THE ACTION

1.     Prior to the Government's imposition of conservatorships over them in September 2008, the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the "Companies") were private, shareholder-owned corporations that maintained a stable and liquid secondary mortgage market by purchasing mortgage loans from other financial institutions, issuing and purchasing mortgage-backed securities ("MBS"), and by "guaranteeing" privately owned mortgage-backed securities. Specifically, under their respective statutory charters, the Companies were responsible for: (1) providing stability in the secondary market for residential mortgages; (2) responding appropriately to the private capital market; (3) providing ongoing assistance to the secondary market for residential mortgages; and (4) promoting access to mortgage credit throughout the country.  Fannie Mae was also charged with managing and liquidating federally owned mortgage portfolios in an orderly manner, "with a minimum of adverse effect upon the residential mortgage market and minimum loss to the Federal Government."  Although the Companies were charged with these public missions, since being privatized they had operated successfully for decades on capital raised from private investors, generating profits and increasing shareholder value, much like any other publicly traded, shareholder-owned company.

2.     During most of the Companies' existence as private corporations, their portfolios contained little or no risky subprime and Alt-A (little or no documentation) mortgages.  Then, during a time of broad financial turmoil that was impacting all financial institutions, the Office of Federal Housing Enterprise Oversight ("OFHEO") and subsequently the Federal Housing Finance Authority ("FHFA") directed that, to support the economy, the Companies purchase subprime and other risky securities and provide additional guarantees for various financial instruments.  Specifically, in 2007, the Companies' lending standards were adjusted to allow them to purchase more subprime securities.  As explained in an October 4, 2008 *New York Times* article, "James B. Lockhart, the chief regulator of Fannie Mae and Freddie Mac, adjusted the

- 1 -

companies' lending standards so they could purchase as much as $40 billion in new subprime

loans. Some in Congress praised the move." But as Lockhart later admitted, these decisions

were not in the best interests of the Companies and they "caused (Fannie Mae and Freddie Mac)

to do things they shouldn't have done."

3.      Following this 2007 regulatory adjustment to the Companies' lending standards,

Congress and regulators encouraged Fannie Mae and Freddie Mac to, and they did, buy subprime

and other risky securities – products that did not meet either Company's own prior lending

standards. At that time, Congressman Barney Frank said, "I'm not worried about Fannie and

Freddie's health, I'm worried that they won't do enough to help out the economy. . . . That's

why I've supported them all these years – so they can help at a time like this."

4.      By the middle of 2008, due in large part to the Government's policies, Fannie

Mae and Freddie Mac had suffered significant losses on certain holdings in their portfolios. Yet

despite those significant losses, which were shared by virtually every other financial institution at

the time, the Companies remained adequately capitalized and were not insolvent.

5.      However, rather than support the Companies on favorable terms similar to those

offered to many other struggling financial institutions at that time, the Government took control

of Fannie Mae and Freddie Mac away from the Companies' shareholders and used the

Companies to warehouse much of the nation's bad mortgage debt and provide unprecedented

levels of liquidity to the nation's mortgage market so that other financial institutions deemed

"too big to fail" could survive and the nation's citizens would still have access to mortgages. In

doing so, the Government destroyed the critical rights of the Companies' shareholders and the

value of their ownership interests in the Companies' securities, effectively nationalizing what

were once shareholder-controlled corporations.

6.      These actions, while beneficial to the economic welfare of the nation, destroyed

the value of Fannie Mae's and Freddie Mac's common and preferred stock and trampled the

private ownership rights and property interests of the shareholders who owned these publicly

traded Companies – the very same companies that the Government had privatized years ago for its own financial benefit.

7.      This Action challenges the Government's decision, implemented through the Director of the FHFA, to appoint the FHFA as conservator for Fannie Mae and Freddie Mac, made on or around September 5, 2008, and announced to the public on September 7, 2008.  In addition, this Action challenges the actions of the Government, acting through the Secretary of the United States Treasury (the "Treasury") and the Director of the FHFA, to enter into senior preferred stock agreements (the "Stock Agreements") with Fannie Mae and Freddie Mac.  The Stock Agreements were unlawful and unwarranted, and taken together with the other unlawful Government actions discussed herein, caused billions of dollars of private property losses to the shareholders who owned these Companies.

8.      Under the terms of the Stock Agreements executed at the time of the conservatorships, in exchange for the Treasury's commitment to provide capital as needed – originally up to $100 billion to each company – Fannie Mae and Freddie Mac each issued to the Treasury $1 billion in senior preferred stock with a cumulative 10% coupon, payable quarterly, which would increase to 12% in the event of a missed dividend payment.  In addition, each company issued to the Treasury common stock warrants representing a 79.9% ownership stake, at a nominal exercise price of $0.00001 per share with warrant duration of 20 years.

9.      As the FHFA Office of Inspector General ("OIG") has since acknowledged, the Government's imposition and subsequent administration of the conservatorships, including its receipt of "a warrant to purchase 80% of the Enterprises' stock for a nominal amount" and its execution of the Stock Agreements "rendered the common [and preferred] shares of the Enterprises virtually worthless," thereby destroying the property rights of the Companies' shareholders, who "effectively lost their investments."  Likewise, the Financial Crisis Inquiry Commission ("FCIC") bluntly concluded that "[e]xisting common and preferred shareholders were effectively wiped out" by the Government's actions.

- 3 -

10.     Even in the middle of an unprecedented financial crisis, the Government cannot convert property rights for its own ends without providing just compensation, even if the Government's "ends" are designed to provide a public benefit.  The Fifth Amendment of the United States Constitution ("Constitution") provides that the Government shall not deprive any person of "property without due process of law" and prohibits the Government from appropriating private property for public use "without just compensation."  Exigent circumstances do not curtail these fundamental rights.  Despite the existence of such fundamental rights, beginning on September 5, 2008, the Government misappropriated billions of dollars of shareholder value in violation of the Takings and Due Process Clauses of the Constitution.

11.     In enacting the Housing and Economic Recovery Act of 2008 ("HERA"), Congress enumerated specific grounds under which the FHFA Director was permitted to appoint the FHFA as conservator over Fannie Mae and Freddie Mac.  Those grounds were specifically tied to each company's ability to operate safely, soundly, and lawfully in the normal course of business.  When the FHFA placed the Companies into conservatorship in September 2008, none of those statutory grounds were sufficiently satisfied and the Government knew that they were not met.  Rather, the Government's decision to place the Companies into conservatorship resulted from separate considerations that were neither covered by nor relevant to the provisions of the governing statute.  Indeed, these considerations had very little, if anything, to do with the financial soundness of the Companies themselves.  As Congressman Barney Frank (D-MA), chairman of the House Financial Services Committee, explained of the decision to place the Companies into conservatorship:  "It's a case where market psychology became more important than the fundamentals. . . . There's no immediate crisis.  It's not like [Fannie Mae and Freddie Mac are] going to run out of money tomorrow or Monday."

12.     At all relevant times leading up to and including the FHFA's decision to place the Companies in conservatorship, Fannie Mae and Freddie Mac were capable of meeting all of their obligations to all creditors, were operating in a safe and sound manner in accordance with all applicable legal requirements, were reporting financial statements in accordance with generally

- 4 -

accepted accounting principles ("GAAP"), had adequate capital that exceeded all applicable regulatory requirements, and were capable of absorbing any losses that they might reasonably incur as a result of the downturn in the financial markets. Simply put, the Companies' financial states did not warrant the imposition of the conservatorships.

13.     Even if a statutory basis existed for the Government's decision to place the Companies into conservatorship, the Government's actions subsequent to establishing the conservatorships – specifically the Government's execution of the Stock Agreements, its elimination of basic shareholder rights, and its instructions to the Companies as their conservator to take on large amounts of additional toxic debt – far exceeded any statutory authority afforded to the FHFA as conservator. After forcing the Companies to execute the Stock Agreements on onerous, costly terms that it set unilaterally, the Government subsequently forced Fannie Mae and Freddie Mac to delist their shares, terminate shareholder meetings, assume tremendous amounts of additional subprime assets, increase their risk exposure by guaranteeing more toxic securities, and accept tens of billions of dollars from the Treasury. In exchange, the Companies were forced to grant the Treasury unprecedented and usurious cumulative dividends of 10% to 12%. None of these actions were in line with sound business principles for the proper operation of these shareholder-owned companies. Rather than preserve and protect the Companies' assets – the proper role of a conservator as directed by statute – the Government used Fannie Mae and Freddie Mac to provide extraordinary support for the nation's mortgage market and other financial institutions at a level never intended by the Companies' original congressional charters. This destroyed the rights and economic value of the Companies' common and preferred stock without providing just compensation to the shareholders who owned these property interests.

14.     Upon announcing the conservatorship, FHFA Director James Lockhart stated that the "Enterprises will be allowed to grow their guarantee [mortgage-backed security] books without limits and continue to purchase replacement securities for their portfolios, about $20 billion per month without capital constraints." Thus, while other prudently operated financial institutions were retreating from their positions in the market to minimize further losses

- 5 -

and preserve shareholder value during this difficult financial time, the Government required Fannie Mae and Freddie Mac, under the conservatorship structure the Government imposed, to do the exact opposite. They were forced to assume more risky assets and increase their overall exposure to additional, future losses by guaranteeing even more MBS, all in order to support other financial institutions and facilitate the Government's public policy objectives. As one commentator noted: "In the first quarter of 2009, after the takeover, Fannie and Freddie's combined share of the purchase of mortgages originated in the quarter was seventy-three percent, reflecting a wholesale withdrawal of private secondary mortgage market players and or banks willing to hold whole loans." Likewise, the FHFA-OIG found that "since September 2008, the private sector has almost entirely abandoned the secondary mortgage market," while Fannie Mae and Freddie Mac "have stepped up to fill the void."

15.     Thus, during the conservatorships, the Companies became virtually the only source of funding for lenders looking to make housing loans. The Government recognized that although it might be financially prudent for the Companies to scale back their business activities and reduce their risk exposure to preserve shareholder value, like all other financial businesses at the time, the Companies' willingness to continue providing liquidity to the mortgage markets on a large scale was crucial to the recovery of the devastated home market and the broader economy. The Government took control of the Companies to make sure this happened on its terms, completely ignoring the loss of rights and economic value it caused to the shareholders who owned securities in the Companies.

16.     In fact, the Government was not very concerned about whether the Companies' new path under its control would be profitable, as they were no longer being managed to maximize shareholder returns. While Fannie Mae and Freddie Mac were directed by the FHFA to purchase more mortgages and guarantee more transactions, the Government set strict limits on the amount of fees the Companies could charge, and at times denied their requests to increase the level of their fees. The Government's refusal, for its own public policy reasons, to approve the Companies' requests to increase their fees was not in the best interests of the Companies and

- 6 -

their shareholders because raising them would have made good business sense in the deteriorating, higher-risk financial environment that was present at the time. It was not until December 2011 that the FHFA finally approved, as part of the payroll tax relief bill, increases to the fees the Companies charged. In September 2012, it authorized additional increases.

17. If the Companies had been allowed to increase their fees earlier to reflect the increased risk in the market, as they had requested, it would have helped Fannie Mae and Freddie Mac generate higher earnings and improve their balance sheets. For example, in March 2011, the Congressional Budget Office found that raising guarantee fees on MBS and loans acquired for the Companies' portfolios by a mere 5 basis points would save $11 billion from 2012-2016 and $27 billion from 2012 to 2021. However, had the Government done this sooner, the higher cost to buyers would have reduced liquidity in the mortgage market, which would have gone against the Government's public policy agenda at the time – namely to use Fannie Mae and Freddie Mac in any way it deemed necessary to bolster the struggling mortgage market and support the nation's foundering economy, even if such actions were detrimental to the overall financial interests of the Companies and their shareholders.

18. The FHFA, acting in its new role as conservator, also forced Fannie Mae and Freddie Mac to substantially increase their loan loss reserves and unnecessarily reduce the value of their applicable deferred tax assets. After the conservatorships were imposed, the value of the deferred tax assets for the companies, which had been previously approved by OFHEO and amounted to billions of dollars, was nearly eliminated by the FHFA. This was done largely to absorb the additional risk exposure caused by the Government instructing the Companies to take on more subprime assets and guarantee more MBS at the height of the financial crisis. It also created the appearance that the Companies were less adequately capitalized than was actually the case, which further fostered the inaccurate perception that the Companies needed large amounts of additional capital going forward – capital that the Treasury was only too willing to provide in exchange for enormous, cumulative dividend payments made pursuant to a predatory lending

arrangement that benefited the Government and the public, but destroyed the private property interests of the Companies' outstanding preferred and common shareholders.

19.     Prior to the appointment of the FHFA as conservator, Fannie Mae and Freddie Mac were owned and controlled by their shareholders. Much of the preferred stock was owned by institutional investors, which the Government had encouraged to purchase these shares. The Government had created strong incentives for banks and other institutions like plaintiff Washington Federal to buy Fannie Mae and Freddie Mac preferred stock, including beneficial capital treatment and beneficial tax treatment. Before the conservatorships were imposed, the total market value of all outstanding shares of common stock of the Companies was over $10 billion, and the total redemption value of all outstanding shares of preferred stock of the Companies was more than $35 billion. As a result of the actions challenged in this case, the value of both the common and preferred stock in the Companies was largely eliminated.

20.     The actions taken by the Government to place Fannie Mae and Freddie Mac into conservatorship and subsequently execute the Stock Agreements, as amended, along with other actions the Government forced upon the Companies to support the mortgage market at unprecedented levels for the public's benefit, expropriated the Companies' common and preferred shareholders' rights and the value of their equity in the Companies without due process, and without just compensation, thereby constituting an impermissible exaction and/or taking in violation of the Fifth Amendment to the Constitution.

## II.     PARTIES

21.     Plaintiff Washington Federal was, at all relevant times, a preferred shareholder of both Fannie Mae and Freddie Mac. Washington Federal is a subsidiary of Washington Federal, Inc., and is headquartered in Seattle, Washington.

22.     Plaintiff Michael McCredy Baker was, at all relevant times, a preferred shareholder of both Fannie Mae and Freddie Mac.

23.     Plaintiff City of Austin Police Retirement System was, at all relevant times, a common shareholder of both Fannie Mae and Freddie Mac.

24.     Defendant United States of America includes the Federal Housing Finance Agency and its agents acting at its direction and the United States Treasury and its agents acting at its direction.

### III.     JURISDICTION AND VENUE

25.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1491(a) and 2501.

26.     Venue is proper under 28 U.S.C. § 1491(a).

### IV.     CONSTITUTIONAL PROVISION

27.     Plaintiffs' claims are governed by the Fifth Amendment to the Constitution, which provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation," and which incorporates the protections of the Equal Protection Clause.

### V.     FACTUAL BACKGROUND

**A.     History of Fannie Mae and Freddie Mac**

**1.     Creation of Fannie Mae and Freddie Mac.**

28.     For decades, Fannie Mae and Freddie Mac have guaranteed the vast majority of all new home mortgages in the United States. During the recent financial crisis, however, they suffered large losses, like virtually every other financial institution at the time. These losses stemmed largely from investments the Companies made at the Government's insistence in the years leading up to, and at the outset of, the 2008 financial crisis. The Government required the Companies to make these investments to accomplish the Government's goals of increasing liquidity in the mortgage market and shoring up the nation's struggling economy.

29.     Fannie Mae was first established by federal statute in 1938 to provide increased liquidity to the nation's home mortgage market. For 30 years thereafter, the Company was operated by the Government. In 1968, however, Fannie Mae was privatized pursuant to the

- 9 -

Housing and Urban Development Act of 1968.  By that time, Congress was loath to keep Fannie Mae's debt included in public debt figures, as the Vietnam War was taking an alarming toll on those same figures.  To ease that burden, Congress reorganized the Company as a government-sponsored enterprise ("GSE") – a federally chartered private corporation that was charged with serving the self-supporting mortgage market.  In so doing, Congress transferred the ownership of Fannie Mae to its new shareholders, enabling the Company to raise capital from the private capital markets and operate much like other publicly traded, shareholder-owned companies while still accomplishing its mission by purchasing mortgages from primary mortgage lenders, purchasing and issuing MBS, and providing guarantees for certain privately owned MBS.

30.     Beginning in 1968, and continuing until June of 2010, Fannie Mae was publicly traded on the New York Stock Exchange (Symbol:  FNM), and was therefore owned by private shareholders.  It regularly obtained funding from private capital on a self-sustaining basis.  Immediately prior to the imposition of the conservatorship, Fannie Mae had more than 597 million preferred shares (in 17 different series with a total redemption value of roughly $21 billion) and also had over one billion shares of common stock outstanding with an approximate market value in excess of $7 billion.

31.     Freddie Mac was established in 1970 by the Emergency Home Finance Act to create a secondary market for conventional mortgages.  In 1989, Freddie Mac was reorganized under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA").  Under FIRREA, Freddie Mac was restructured in a manner similar to Fannie Mae, *i.e.*, a for-profit corporation owned by private shareholders.

32.     From 1984 until June of 2010, Freddie Mac was publicly traded on the New York Stock Exchange (Symbol:  FRE), and was therefore owned by private shareholders.  It regularly obtained funding from private capital on a self-sustaining basis.  Immediately prior to the imposition of the conservatorship, Freddie Mac had more than 464 million preferred shares (in 24 different series with a total redemption value of roughly $14 billion), and also had

- 10 -

approximately 650 million shares of common stock outstanding with an approximate market value of $3.3 billion.

33.     Although the Companies were charged with a public mission, they operated successfully for decades on capital raised from investors through the private capital markets, generating profits and increasing shareholder value, much like any other publicly traded, shareholder-owned company.  In fact, the first page of Fannie Mae's quarterly report for the period ended June 30, 2008, as filed with the SEC on Form 10-Q, describes Fannie Mae as "a government-sponsored enterprise ('GSE'), *owned by private shareholders* (NYSE: FNM) and chartered by Congress to support liquidity and stability in the secondary mortgage market." (Emphasis added.)

34.     As with any other publicly traded company, owners of Fannie Mae and Freddie Mac stock were vested with specific rights attendant to their ownership.  These rights were specifically enumerated in each Company's by-laws and the prospectuses and registration statements for each of the Companies' common stock and series of preferred stock.

35.     The by-laws and offering documents for Fannie Mae's and Freddie Mac's common stock enumerated specific rights held by each Company's common shareholders, and these rights were typical of those rights usually associated with the private property interest represented by common stock in a shareholder-owned company.  For example, these included the right of the Companies' common shareholders to transfer their shares of stock and to vote for candidates for these Companies' boards of directors and shareholder proposals.  The owners of Fannie Mae's and Freddie Mac's common stock also had the right to receive a portion of the Companies' assets in the event of dissolution or liquidation.

36.     The offering documents for Fannie Mae's preferred stock enumerated specific rights held by its preferred shareholders typical of those rights often held by preferred stockholders in a shareholder-owned company.  For instance, these shares were transferrable. Likewise, the offering circular for Fannie Mae's Series T preferred shares, like numerous other series of its preferred stock offerings, indicated that holders of those shares would have the right

- 11 -

to receive a portion of the Company's assets in the event of dissolution or liquidation. In addition, Fannie Mae preferred shareholders had the right to vote on amendments to their series' certificate of designation, subject only to narrow exceptions.

37.     Similarly, the offering documents for Freddie Mac's preferred stock enumerated specific rights held by its preferred shareholders typical of those rights often held by preferred stockholders in a shareholder-owned company. For instance, these shares of preferred stock were transferrable. Likewise, the offering circular for Freddie Mac's Series Z preferred shares, like numerous other series of its preferred stock offerings, indicated that holders of those shares would have the right to receive a portion of the Company's assets in the event of dissolution or liquidation. In addition, Freddie Mac preferred shareholders had the right to vote on amendments to their series' certificate of designation, subject only to narrow exceptions.

### 2.     The Success of Fannie Mae and Freddie Mac With Investors

38.     Private investors long considered Fannie Mae and Freddie Mac securities to be popular, sound, conservative investments. In fact, even as late as August 7, 2008, Fannie Mae's preferred stock was rated "AA-" by S&P, "A1" by Moody's and "A+" by Fitch.

39.     The popularity, transferability and soundness of the Companies' securities, prior to the conservatorships, were clearly evidenced by, among other factors, the extent to which these shares were traded on the open market. For example, during the three years before Fannie Mae was placed into conservatorship, *i.e.*, from September 5, 2005, through September 5, 2008, Fannie Mae's common stock had an average daily trading volume of more than 13 million shares. Likewise, during the same time period, Freddie Mac's common stock had an average daily trading volume of more than 12 million shares.

40.     Moreover, at the time the conservatorship was imposed, Fannie Mae had 17 series of preferred stock outstanding. These series of preferred stock were overwhelmingly popular and allowed the Company to easily raise substantial capital in the private capital markets, as follows:

## Fannie Mae Preferred Shares Outstanding As of Date of Conservatorship

| Series | Rate | CUSIP | Date | Shares | Redemption Value per Share | Total Redemption Value |
|--------|------|-------|------|--------|-----------|-----------|
| D | 5.250% | 313586505 | 09/30/98 | 3,000,000 | 50.00 | $150,000,000 |
| E | 5.100% | 313586604 | 04/15/99 | 3,000,000 | 50.00 | 150,000,000 |
| F | Variable | 313586703 | 03/20/00 | 13,800,000 | 50.00 | 690,000,000 |
| G | Variable | 313586802 | 08/08/00 | 5,750,000 | 50.00 | 287,500,000 |
| H | 5.810% | 313586885 | 04/06/01 | 8,000,000 | 50.00 | 400,000,000 |
| I | 5.375% | 313586877 | 10/28/02 | 6,000,000 | 50.00 | 300,000,000 |
| L | 5.125% | 313586844 | 04/29/03 | 6,900,000 | 50.00 | 345,000,000 |
| M | 4.750% | 313586836 | 06/10/03 | 9,200,000 | 50.00 | 460,000,000 |
| N | 5.500% | 313586828 | 09/25/03 | 4,500,000 | 50.00 | 225,000,000 |
| O | Variable | 313586794 | 12/30/04 | 50,000,000 | 50.00 | 2,500,000,000 |
| 2004-1 | 5.375% | 313586810 | 12/30/04 | 25,000 | 100,000.00 | 2,500,000,000 |
| P | Variable | 313586786 | 09/28/07 | 40,000,000 | 25.00 | 1,000,000,000 |
| Q | 6.750% | 313586778 | 10/04/07 | 15,000,000 | 25.00 | 375,000,000 |
| R | 7.625% | 313586760 | 11/21/07 | 21,200,000 | 25.00 | 530,000,000 |
| S | Variable | 313586752 | 12/11/07 | 280,000,000 | 25.00 | 7,000,000,000 |
| 2008-1 | 8.750% | 313586745 | 05/14/08 | 41,696,401 | 50.00 | 2,084,820,050 |
| T | 8.250% | 313586737 | 05/19/08 | 89,000,000 | 25.00 | 2,225,000,000 |

**Totals**                      <u>597,071,401</u>          <u>$21,222,320,050</u>

41.    Likewise, at the time the conservatorship was imposed, Freddie Mac had 24 series of preferred stock outstanding.  These series of preferred stock were overwhelmingly popular and allowed the Company to easily raise substantial capital in the private capital markets, as follows:

- 13 -

**Freddie Mac Preferred Shares Outstanding As of Date of Conservatorship**

| Series | Rate | CUSIP | Date | Shares | Redemption Value per Share | Total Redemption Value |
|---|---|---|---|---|---|---|
| B | Variable | 313400608 | 04/26/96 | 5,000,000 | 50.00 | $250,000,000 |
| NotListed | 5.81% | 313400889 | 10/27/97 | 3,000,000 | 50.00 | 150,000,000 |
| F | 5.00% | 313400863 | 03/23/98 | 8,000,000 | 50.00 | 400,000,000 |
| G | Variable | 313400848 | 03/23/98 | 4,395,000 | 50.00 | 219,750,000 |
| H | 5.10% | 313400855 | 09/23/98 | 8,000,000 | 50.00 | 400,000,000 |
| Not Listed | 5.30% | 313400822 | 10/28/98 | 4,000,000 | 50.00 | 200,000,000 |
| Not Listed | 5.10% | 313400814 | 03/19/99 | 3,000,000 | 50.00 | 150,000,000 |
| K | 5.79% | 313400830 | 07/21/99 | 5,000,000 | 50.00 | 250,000,000 |
| L | Variable | 313400798 | 11/02/99 | 5,750,000 | 50.00 | 287,500,000 |
| M | Variable | 313400780 | 01/26/01 | 6,500,000 | 50.00 | 325,000,000 |
| N | Variable | 313400764 | 03/23/01 | 4,600,000 | 50.00 | 230,000,000 |
| O | 5.81% | 313400772 | 03/23/01 | 3,450,000 | 50.00 | 172,500,000 |
| P | 6.00% | 313400749 | 05/30/01 | 3,450,000 | 50.00 | 172,500,000 |
| Q | Variable | 313400756 | 05/30/01 | 4,025,000 | 50.00 | 201,250,000 |
| R | 5.70% | 313400731 | 10/30/01 | 6,000,000 | 50.00 | 300,000,000 |
| Not Listed | 5.81% | 313400723 | 01/29/02 | 6,000,000 | 50.00 | 300,000,000 |
| S | Variable | 313400715 | 07/17/06 | 15,000,000 | 50.00 | 750,000,000 |
| T | 6.42% | 313400699 | 07/17/06 | 5,000,000 | 50.00 | 250,000,000 |
| U | 5.90% | 313400681 | 10/16/06 | 20,000,000 | 25.00 | 500,000,000 |
| V | 5.57% | 313400673 | 01/16/07 | 44,000,000 | 25.00 | 1,100,000,000 |
| W | 5.66% | 313400665 | 04/16/07 | 20,000,000 | 25.00 | 500,000,000 |
| X | 6.02% | 313400657 | 07/24/07 | 20,000,000 | 25.00 | 500,000,000 |
| Y | 6.55% | 313400640 | 09/28/07 | 20,000,000 | 25.00 | 500,000,000 |
| Z | 8.38% | 313400624 | 12/04/07 | 240,000,000 | 25.00 | 6,000,000,000 |

**Totals**         **464,170,000**         **$14,108,500,000**

**3.**      **The Housing and Community Development Act of 1992 and the Government's Confidence in the Financial Health of the Companies**

42.     In 1992, Congress enacted the Federal Housing Enterprises Financial Safety and Soundness Act as Title XIII of the Housing and Community Development Act, Pub. L. No. 102-550, 102 Stat. 3672 (1992) (the "1992 Act"). Section 1302 of the 1992 Act included Congress' findings that Fannie Mae and Freddie Mac "currently pose low financial risk of insolvency" and noted the need for a regulatory entity for the Companies that "should have the authority to

establish capital standards, require financial disclosure, prescribe adequate standards for books and records and other internal controls, conduct examinations when necessary, and enforce compliance with the standards and rules that it establishes . . . ."

43.     Section 1311 of the 1992 Act also established OFHEO as an independent agency within the Department of Housing and Urban Development ("HUD") to serve as the Companies' chief regulator.

44.     In addition, the 1992 Act amended the Companies' charters, requiring them to meet an "affirmative obligation to facilitate the financing of affordable housing for low-income and moderate-income families." HUD was designated as the Companies' affordable housing mission regulator.

45.     The 1992 Act established capital standards for the Companies and gave OFHEO authority to conduct routine safety and soundness examinations of Fannie Mae and Freddie Mac and to take enforcement actions.

46.     The various enforcement actions available to the OFHEO Director included the authority to place either Company into conservatorship. The 1992 Act prescribed seven situations in which this authority might be exercised:

A.     if a Company became significantly undercapitalized, as defined by the Act;

B.     if a Company became critically undercapitalized, as defined by the Act;

C.     if a Company became unlikely to pay its obligations in the normal course of business;

D.     if a Company incurred, or was reasonably likely to incur, losses that would deplete substantially all of its core capital, and it was unlikely the enterprise would be able to replenish its core capital within a reasonable period;

E.     if a Company concealed or refused to produce its books and records needed in order for the OFHEO Director to discharge his responsibilities under the 1992 Act;

- 15 -

F.      if a Company willfully violated a final cease-and-desist
        order issued by the Director; or

G.      if a majority of either a Company's shareholders or board
        of directors consented to a conservatorship.

**B.      Freddie Mac and Fannie Mae Troubles Had Never Previously Warranted
        Conservatorship**

47.      In January 2003, Freddie Mac announced that it would need to restate its earnings

for 2002, 2001, and 2000 because its new auditor had discovered accounting practices that were

not in conformance with GAAP.  Pursuant to a consent order with OFHEO, Freddie Mac's board

of directors retained an outside law firm to investigate.  The investigation uncovered numerous

irregularities.  In December 2003, OFHEO published an extensive report on the outside

investigation, detailing a number of findings indicating mismanagement and improper

accounting practices.  Even though the Company paid a civil penalty to OFHEO and agreed to

take corrective measures specified by the agency, this situation was not deemed sufficient to

invoke the conservatorship authority established in the 1992 Act.

48.      The misconduct uncovered at Freddie Mac prompted OFHEO to conduct an

investigation of Fannie Mae, and in September 2004, a special committee of Fannie Mae's board

of directors agreed with OFHEO to retain an outside law firm to investigate certain irregularities

that had been identified at the Company.  In February 2006, the outside law firm reported

numerous improprieties at Fannie Mae, including mismanagement and improper accounting

practices.  Thereafter, OFHEO published an extensive report detailing the misconduct at the

Company, and the SEC forced it to restate its financial results for 2002 through mid-2004.

Again, as with Freddie Mac, even though the Company paid OFHEO a substantial civil penalty,

the regulator found no reason to exercise its conservatorship authority.

C.  **The Government's Actions Weakened the Companies' Financial Strength By Requiring Them to Increase Their Holdings in Riskier Mortgages and Mortgage-Backed Instruments**

49.  Throughout their existence as public companies, the Companies were charged, to varying degrees, with attempting to increase home ownership in the United States.  However, in 2001, HUD dramatically increased the affordable housing quota to 50% of each company's mortgage portfolio, and by 2006, low- and moderate-income mortgages accounted for nearly 57% of each company's mortgage portfolio.

50.  Congress and even OFHEO itself repeatedly exerted pressure on Fannie Mae and Freddie Mac to delve deeper into the subprime and Alt-A mortgage market.  As Senator Jack Reed (D-RI) told Fannie Mae's then-CEO, Daniel Mudd, at a Congressional hearing in 2006, "[w]hen homes are doubling in price in every six years and incomes are increasing by a mere one percent per year, Fannie's mission is of paramount importance."  Senator Reed insisted that, "[i]n fact, Fannie and Freddie can do more, a lot more."

51.  In August 2007, OFHEO directed Fannie Mae and Freddie Mac to apply the *Statement on Subprime Mortgage Lending* and the *Interagency Guidance on Nontraditional Mortgage Product Risks* – guidance statements resulting from, and issued by, a collaborative effort by federal banking regulatory agencies – to their purchases of private-label securities and subprime loans, including bulk purchases.  Upon the announcement that both companies had implemented these directives, James B. Lockhart, then-director of OFHEO (later director of the FHFA), commended the Companies, stating: "These actions represent another significant step in promoting sound underwriting practices, enabling homeowners to select from prudent mortgage vehicles, and restoring confidence in the mortgage finance system."  He continued: "I commend the Enterprises for their implementation of the directives. . . .  These actions, which address the practices of both regulated and unregulated mortgage originators, reinforce the historic and statutory role of Fannie Mae and Freddie Mac in promoting market liquidity through standardization of mortgage underwriting. . . .  Such safe and sound underwriting practices serve the interests of borrowers and lenders in promoting sustained homeownership."

52.     At the same time, Lockhart adjusted the Companies' lending standards so that they could purchase as much as $40 billion, combined, in new subprime loans.  At that time, Congressman Barney Frank, chairman of the House Financial Services Committee, voiced support for increased lending activity, stating that, "I'm not worried about Fannie and Freddie's health, I'm worried that they won't do enough to help out the economy. . . .  That's why I've supported them all these years."

53.     Faced with directives from Congress and agency regulators to accumulate subprime and Alt-A holdings, the Companies did as they were told.  As Fannie Mae's former CEO, Daniel Mudd, later explained, "Fannie Mae faced the danger that the market would pass us by. . . .  *We were afraid that lenders would be selling products we weren't buying and Congress would feel like we weren't fulfilling our mission.*  The market was changing, and it's our job to buy loans, so we had to change as well." (Emphasis added.)  As FHFA Director James B. Lockhart, III later lamented, "[in] retrospect . . . [affordable housing goals] caused (Fannie Mae and Freddie Mac) to do things they shouldn't have done."

54.     On March 19, 2008, OFHEO further exacerbated the Companies' accumulation of high risk holdings by easing their capital restraints from 30% to 20% in exchange for the Companies' agreement to raise "significant capital" at an indeterminate point in the future.  After Fannie Mae raised $7.4 billion, OFHEO further lowered the capital surcharge from 20% to 15%.  Freddie Mac decided not to raise additional capital, and therefore its capital surcharge remained the same.

55.     Despite the Government's ill-advised policies, the Companies had less exposure to toxic mortgages than many other financial institutions, and they did not have significant amounts of risky mortgage debt on their books until 2006.  The Government has admitted that "delinquency rates on many PLS [private-label securities] and other loans held by banks and other private market institutions were far higher than on the loans held by Fannie Mae and Freddie Mac."

- 18 -

**D.      The Housing and Economic Recovery Act of 2008 and the Government's Continued Expressions of Confidence in the Companies and Their Financial Strength**

56.      As the financial crisis deepened, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA") on July 24, 2008.  HERA replaced OFHEO with the FHFA and gave the Government, through the powers granted to the FHFA, much greater regulatory authority over Fannie Mae and Freddie Mac than had ever previously been authorized.  Notably, HERA referred to the Companies (and the Federal Home Loan Bank) as "regulated entities," a phrase that was not used in the 1992 Act.

57.      Under the new regulatory regime established by HERA, the FHFA was given new authority to place the Companies into receivership and expanded authority to place them into conservatorship.  In advocating on behalf of HERA, Treasury Secretary Paulson told the Senate that regulators needed "a bazooka" at their disposal, but made clear that "[y]ou are not likely to take it out."  He added, "I just say that by having something that is unspecified, it will increase confidence.  And by increasing confidence it will greatly reduce the likelihood it will ever be used."

58.      In supporting and enacting HERA, members of Congress repeatedly emphasized the health and viability of both Fannie Mae and Freddie Mac, and expressly rejected the notion that a conservatorship would ever be imposed on either Company.  Congresswoman Lois Capps (D-CA) summarized the view of Congress:

> The recent troubles at Fannie Mae and Freddie Mac have shaken the economy and the bill seeks to stabilize them by extending them limited credit and other financial support from the U.S. Treasury. These institutions are the central nervous system of mortgage liquidity in the United States, and ensuring their continued operations is vital to avoiding even more calamity in our housing markets.  To help avert future mortgage crises, the bill creates a new, strong regulator for Fannie Mae and Freddie Mac.

154 Cong. Rec. E1555-01 (2008).

59.      Congressman James Langevin (D-RI) expressed his view that HERA and the FHFA would "ensure that our nation's largest mortgage-backers, Fannie Mae and Freddie Mac,

- 19 -

remain strong." 154 Cong. Rec. E1559-04 (2008).  Senator Reed (D-RI) similarly stated that "this legislation helps restore confidence in Fannie Mae and Freddie Mac.  It creates a new, strong, independent, world-class regulator for Fannie Mae, Freddie Mac, and the Federal Home Loan Banks." 154 Cong. Rec. S7436-01 (2008).  Senator Reed explained further that:

> Restoring confidence in Fannie and Freddie and the marketplace is one of the building blocks to beginning to restore and rebuild our economy going forward.  The provisions will, I hope, do it in such a way that they provide psychological support so that actually drawing down funds by Fannie Mae and Freddie Mac may be unnecessary.  This backstop will send, I think, the right message to the marketplace so we can move on to begin to deal with some other issues with respect to the larger financial markets of this country, and indeed the world.

*Id.*

60.     In describing the FHFA's new powers, Senator Reed further stated that "[a]ll of these are the powers which we have extended historically to bank regulators, and now these powers are being extended to the regulator of three of the most prominent financial institutions in the country, although their focus is on housing exclusively, or generally." 154 Cong. Rec. S6097-08 (2008).  Importantly, these regulatory powers were much greater than those that existed prior to July 2008, when the vast majority of the Companies' common and preferred shareholders purchased their shares in Fannie Mae and Freddie Mac.

61.     In support of the bill, Senator Isakson (R-GA) further explained that:

> The bill we are doing tomorrow is not a bailout to Freddie Mac and Fannie Mae or the institutions that made bad loans. ***It is an infusion of confidence the financial markets need.***  Fannie and Freddie suffer by perception from the difficulties of our mortgage market. ***If anybody would take the time to go look at the default rates, for example, they would look at the loans Fannie Mae holds, and they are at 1.2 percent, well under what is considered a normal, good, healthy balance.***  The subprime market's defaults are in the 4 to 6 to 8-point range.  That is causing that problem.  That wasn't Fannie Mae paper, and it wasn't securitized by Fannie Mae. ***They have $50 billion in capital, when the requirement is***

*to have $15 billion, so they are sound.* But the financial markets, because of the collapse of the mortgage market, have gotten worse.

I think Secretary Paulson has done the right thing. I commend Senator Dodd and Senator Shelby for the second key component of the bill. The Dodd-Shelby provision ensures that Fannie Mae and Freddie Mac will have regulatory oversight and be held accountable, as the banking system in our country is. What Paulson has done is said, in return for that, we will give to Freddie and Fannie what the American banking institutions have and that is access to the Treasury window for secured collateralized borrowing.

You might say: What does all this mean? What it means is we will put liquidity back into the mortgage market. There will be good underwriting and accountable credit issued by the mortgages that are then sold to Freddie Mac and Fannie Mae to provide the liquidity in the marketplace. This is not a bailout for those two institutions. It is an insurance policy that the credit markets will understand that, A, those institutions are strong and the United States is going to hold them accountable and, B, provide them with liquidity when they need it. That is good for this country and this economy, and it would be a tragedy if tomorrow this Senate doesn't overwhelmingly embrace that legislation. [Emphasis added.]

154 Cong. Rec. S7436-01 (2008).

62.     Around the same time, other government officials and executives at both Companies went out of their way to reinforce the public's positive views of Fannie Mae and Freddie Mac. On June 9, 2008, OFHEO published a News Release stating that the Director "classified Fannie Mae and Freddie Mac as adequately capitalized as of March 31, 2008." This News Release also noted that the Companies were maintaining "overall capital levels well in excess of the requirements."

63.     On July 10, 2008, two weeks before HERA was enacted, then-Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben Bernanke testified before the House Financial Services Committee that Fannie Mae and Freddie Mac were both "adequately capitalized." The following day, Fannie Mae's then-Senior Vice President Chuck Greener, backed by then-CEO Daniel Mudd, issued a statement touting Fannie Mae's capital strength:

- 21 -

Fannie Mae raised $7.4 billion of additional capital in May [2008], for a total of more than $14 billion in new capital since November of 2007. Our capital level is substantially above both our statutory minimum capital and the OFHEO-required 15 percent surplus over minimum capital. In fact, we have more core capital, and a higher surplus over our regulatory requirement, than at any time in this company's history.

As we work through this tough housing market, we are maintaining a strong capital base, building reserves for our credit losses, and generating solid revenues as our business continues to serve the market. We also have access to ample sources of liquidity, including access to the debt markets. The company issued more than $24 billion in debt this week alone, including a $3 billion benchmark note sale that was oversubscribed. In short, Fannie Mae remains well equipped to fulfill our critical role in the housing finance system, today and in the future. We will provide a full financial update and outlook when we report second-quarter results in early August.

OFHEO has reiterated that Fannie Mae is adequately capitalized, the highest capital designation given by our regulator. More broadly, Treasury Secretary Henry Paulson and leaders in Congress have also issued statements of support, for which we are appreciative.

64.    Nearly one month later, when releasing its Second Quarter 2008 financial results on August 6, 2008, Freddie Mac Chairman and Chief Executive Officer Richard F. Syron provided similar assurances about Freddie. He stated that:

While we expect continued housing and economic weakness will affect our overall performance this year, we continue to maintain a surplus over all regulatory capital requirements. We remain committed to raising $5.5 billion of new capital and will evaluate raising capital beyond this amount depending on our needs and as market conditions mandate. We are confident the actions we are taking are strengthening Freddie Mac's financial and competitive position as well as its ability to serve the American homebuyer and will generate value well into the future.

* * *

Freddie Mac's revenue increased by more than 10 percent from the first quarter, including a more than 90 percent increase in net interest income. We are capitalized above regulatory requirements and we continue to have open access to the debt markets.

- 22 -

65.     On July 10, 2008, the OFHEO Director issued another News Release in which he made the following statement regarding Fannie Mae and Freddie Mac: "As I have said before, they are adequately capitalized, holding capital well in excess of the OFHEO-directed requirement, which exceeds the statutory minimums.  They have large liquidity portfolios, access to the debt market and over $1.5 trillion in unpledged assets."

66.     On July 10, 2008, Secretary Paulson testified before the House Banking Committee, and stated that OFHEO "has made clear that [Fannie Mae and Freddie Mac] are adequately capitalized."  Secretary Paulson similarly confirmed the adequacy of the Companies' capitalization in testimony given to the Senate Banking Committee on July 15, 2008.

**E.     Fannie Mae and Freddie Mac Are Improperly Placed in Conservatorship**

    **1.     Government Actions Leading to Imposition of the Conservatorship**

        **a.     The Government dramatically changed capital requirements to make the Companies appear unsound.**

67.     On June 10, 2008, OFHEO announced a final rule that changed the mortgage loan loss severity formulas used in the Companies' regulatory risk-based capital stress test.  OFHEO announced that this new risk-based capital stress test would be formally applied beginning with the third quarter 2008 capital classification.  These new standards dramatically increased the risk-based capital requirement.  Fannie Mae estimated that these changes would have boosted the statutory risk-based capital requirement from $23.1 billion in March 2008 to $30.4 billion -- an increase of 31.6%.

        **b.     The Government's conservatorship plan was hatched in secrecy and gave the Companies no choice but to accept Government control.**

68.     Despite their prior assurances to the public that both Fannie Mae and Freddie Mac were financially sound, on September 7, 2008, less than two months after the enactment of HERA, FHFA Director Lockhart and Treasury Secretary Paulson blindsided the Companies and their shareholders by placing the Companies into conservatorship and taking control away from the shareholders, generally citing both companies' purported financial troubles.  In a prepared

- 23 -

statement, Paulson stated that "[b]ased on what we have learned about these institutions over the last four weeks – including what we learned about their capital requirements – and given the condition of financial markets today, I concluded that it would not have been in the best interest of the taxpayers for Treasury to simply make an equity investment in these enterprises in their current form."

69.     Despite admitting to having "analyzed in great detail the current financial condition of the GSEs" for a four-week period prior to the imposition of the conservatorships, the Government intended to keep this plan secret until the last possible minute.  As explained in Secretary Paulson's memoir, *On the Brink*, the Secretary met with President George W. Bush only three days before the conservatorships were publicly announced and told him that "[w]e're going to move quickly and take them by surprise.  The first sound they'll hear is their heads hitting the floor."

70.     In his September 7, 2008 statement announcing this unprecedented Government action, Lockhart misleadingly stated that "[t]he Boards of both companies consented yesterday to the conservatorship."  However, the Board's "consent" was by no means voluntary.  On the contrary, it was obtained through intimidation and coercion by the Government.  Just two days prior to the September 7th announcement, Paulson and other top governmental officials had summoned the senior executives at Fannie Mae and Freddie Mac to secret meetings, where they were told that they would either accept Government control within 24 hours or the Government would impose it by force.  Paulson misleadingly told them that "[w]e have the grounds to do this on an involuntary basis, and we will go that course if needed."

71.     In a 2009 speech, Mudd explained that "we were given 24 hours to accede to a government takeover – or else the government would effectively go to war against the company."  The FCIC concluded that "[e]ssentially the GSEs faced a Hobson's choice:  take the horse offered or none at all."  Secretary Paulson himself told the Commission that the Government team made "a very strong case so the board of directors did not have a choice" and that he told the Companies that, while the Government had authority to inject capital into them, it

- 24 -

would not do so unless they were in conservatorship. This was a dramatically different scenario than what recently had been described by Senator Isakson, in explaining the intention of HERA, as granting "access to the Treasury window" much like the access to capital that is given to banks. In fact, the access to capital from the Treasury was being provided to Fannie Mae and Freddie Mac on far more onerous and extremely costly terms, which were severely detrimental to the private property interests of their shareholders, and the boards of directors at the Companies were not given any real choice in the matter. As Paulson later explained to the FCIC, "I believed the very best way to get them to agree on a friendly basis was to say 'there's a hard way and an easy way, and we hope and expect them to take [the] easy way. Which they did.[']"

72.    The Companies were thus presented with the "facts" that purportedly supported the imposition of the conservatorships. Those facts had been developed in secrecy, while officials at every level of the Government were making assurances about the Companies' solvency. No one at the Government communicated these "findings" to the Companies, their shareholders, or the public prior to imposing the conservatorships. In fact, the FHFA was confident enough in the Companies' solvency that, on August 22, just two weeks before the Government imposed the conservatorships, the FHFA stated in a letter to both Mudd and Syron that the Companies had adequate levels of capital. Before the Government imposed the conservatorships, the Treasury demanded that the letter be withdrawn, because it was inconsistent with the Government's soon-to-be-announced position that the conservatorships were required. On October 9, 2008, the FHFA announced that it would no longer provide capital classifications for the Companies.

73.    The Companies' boards of directors never "consented" to the conservatorships. The conservatorships were presented to them as a take-it-or-leave-it proposition at a time when the financial markets were in turmoil and the economy needed additional support from the Companies. Knowing that it lacked a statutory basis for doing so, the Government threatened to take control of the Companies regardless of whether their boards of directors consented to the conservatorships, thereby leaving them no real choice. And even though the Government

- 25 -

extended other financial institutions less costly and far less extreme forms of financial assistance, the Government gave no such options to Fannie Mae and Freddie Mac and their shareholders.

> **c.** **The Government's motive for imposing the conservatorships was to maintain liquidity in the U.S. mortgage market, in part, by bailing out other financial institutions holding high-risk mortgages and mortgage-backed instruments.**

74. The decision to appoint the FHFA as conservator for the Companies was not based on the grounds set forth in 12 U.S.C. § 4617, but rather on the broader public policy objective of restoring confidence and liquidity in the financial markets by, among other things, providing a mechanism for other financial companies to unload their bad mortgage debts. At the time, nearly every major financial institution was carrying debilitating amounts of such debt, and the Government saw in the Companies a place to transfer, or guarantee, that toxic debt and facilitate its removal from the balance sheets of those other institutions. Recognizing this opportunity, as well as the Government's desire, for public policy reasons, to make absolutely sure the Companies continued to provide large amounts of liquidity to the mortgage market and support the nation's economy, it took control of Fannie Mae and Freddie Mac away from their shareholders and forced the Companies to assume large amounts of additional high-risk debt, and guarantee even more risky assets, with complete disregard for whether this was in the best interests of the Companies and their shareholders. Faced with a mounting financial crisis, the Government saw Fannie Mae and Freddie Mac as "the only game in town." As Secretary Paulson explained to the FCIC, "[the GSEs], more than anyone, were the engine we needed to get through the problem." As a result of the Government's actions, the Companies became "the mortgage industry's wastebasket for toxic mortgage debt."

75. Whatever the validity of these goals from a public policy perspective, they did not constitute a legal basis for imposing conservatorships over the Companies and taking control away from their shareholders, and they had very little, if anything, to do with the Companies' financial health. As Secretary Paulson told CNBC's Steve Liesman, "We didn't sit there and figure this out with a calculator. This was about our financial markets, it was about confidence

in the financial markets, confidence in our economy, and the validity of the mortgage finance [market]."

76.     And, as Congressman Barney Frank explained, "[i]t's a case where market psychology became more important than the fundamentals. . . . There's no immediate crisis. It's not like [Fannie Mae and Freddie Mac are] going to run out of money tomorrow or Monday. It's a decision that the market is simply not going to accept the status quo."

77.     In Freddie Mac's 2011 Form 10-K, issued under FHFA control, the Company provided significant insight into the loss of shareholders' rights and value caused by the Government's actions, as well as the Government's true objectives:

> Certain changes to our business objectives and strategies [under the conservatorship] are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives. However, these changes to our business objectives and strategies may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near-term. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the [Stock] Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results . . . .

78.     The Stock Agreements, forced upon the Companies immediately after the Government assumed control of them, further supported the Government's public policy goals while causing new and additional losses of shareholder value and rights. They placed the Companies in a never-ending cycle of borrowing from the Treasury merely to pay the dividends required by those Stock Agreements, and they were designed to ensure, along with the Third Amendment, that the Companies could never return to their former status as shareholder-controlled corporations. The Government has made no bones about its intention. On August 17, 2012, in announcing the execution of the Third Amended Stock Agreements, the FHFA Acting Director Edward J. DeMarco stated that the amendment merely reaffirmed the Government's

Strategic Plan for the conservatorships of the Companies, including "gradually contracting their operations."

### d.    The conservatorships obliterated shareholder value.

79.    Under the terms of the conservatorships, the FHFA assumed the powers of the Companies' boards of directors and management, and the Companies' CEOs were dismissed.  It terminated all shareholder meetings and all shareholder voting rights.  These Government actions caused the Companies' preferred and common stock values to plummet.  The common stock of Fannie Mae and Freddie Mac subsequently traded at less than $1.00 per share – down from over $7.04 per share and $5.10 per share, respectively, immediately prior to the imposition of the conservatorship.  Preferred shares of each of the Companies subsequently traded at roughly 2-15% of redemption value immediately following the imposition of the conservatorship.

80.    The placement of the Companies into conservatorship and the subsequent actions taken by the Government erased shareholder value and destroyed the rights and property interests of the Companies' preferred and common shareholders.  While the Government guaranteed payments on the Companies' outstanding debt instruments through financing agreements with the Treasury, the Companies were ordered to cease paying dividends on their preferred and common stock.  Although this stock would remain outstanding, on June 16, 2010, the FHFA ordered the Companies to delist their common and preferred shares from the New York Stock Exchange.  The loss of rights and value suffered by the Companies' shareholders on account of the Government's actions is noted in Fannie Mae's Form 10-K for the year ending December 31, 2011, issued under the FHFA's control: "[b]ecause we are in conservatorship, our common shareholders currently do not have the ability to elect directors or to vote on other matters.  The conservator eliminated common and preferred stock dividends (other than dividends on the senior preferred stock issued to the Treasury) during the conservatorship, and *we are no longer managed with a strategy to maximize shareholder returns*." (Emphasis added.)

- 28 -

2.   **The Government Bullied and Coerced the Companies' Boards of Directors Into Consenting to the Conservatorships, Thus Rendering Their Consent Invalid.**

81.   Title 12, section 4617(a)(3)(I) provides that the FHFA may be appointed conservator of a GSE when "[t]he regulated entity, by resolution of its board of directors or its shareholders or members, consents to the appointment." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

82.   The shareholders of Fannie Mae did not consent, by resolution or other means, to the appointment of a conservator. Likewise, the shareholders of Freddie Mac did not consent, by resolution or other means, to the appointment of a conservator. Instead, as explained above (¶¶ 68-73), the Companies were threatened and given a mere 24 hours to either accept the conservatorships or have them forced upon them. The *de minimis* period afforded to the Companies' board members to consider the appointment of the FHFA as conservator was inadequate for meaningful deliberation, rendering any purported consent given by any of the Companies' board members unsubstantiated and invalid.

83.   In his September 7, 2008 public announcement of the appointment of a Conservator, Director Lockhart stated that "[t]he Boards of both companies [Fannie Mae and Freddie Mac] consented yesterday to the conservatorship." However, Director Lockhart has since explained to the FCIC that the Government wanted to claim it had the Companies' consent because, in his words "they were adequately capitalized" and, absent the so-called "consent," there was no statutory basis for the conservatorship.

84.   By September 4, 2008, if not earlier, Government officials had decided to impose conservatorships upon Fannie Mae and Freddie Mac, come hell or high water. As Secretary Paulson told President Bush on that date, "[w]e're going to move quickly and take them by surprise. The first sound they'll hear is their heads hitting the floor."

85.   The following day, September 5, 2008, Director Lockhart and Secretary Paulson summoned Fannie Mae's and Freddie Mac's CEOs, Daniel Mudd and Richard Syron, respectively, to a meeting at which Mudd and Syron were told, in no uncertain terms, that the

Companies would be placed in conservatorship. Secretary Paulson and Director Lockhart emphasized that the Companies had no other option, and that they expected the Companies' boards of directors to comply. Paulson misleadingly told them: "We have the grounds to do this on an involuntary basis, and we will go that course if needed."

86.     Secretary Paulson regarded his role in the meetings with Mudd and Syron as follows: "My role in these meetings was always to say, 'This is going to happen. This is about the United States of America, our capital markets, our economy. Be part of the solution. It won't be good for anyone if you don't consent. I need to know this evening. Your lawyers can spend a lot of time – then we won't get there, and then it will be involuntary.'"

87.     Further, HERA immunized the Companies' directors against liability for consenting to the appointment of the FHFA as conservator. *See* 12 U.S.C. § 4617(a)(6). The Government played on this immunity to persuade the Companies' management and directors to accede to the Government's demands, despite the absence of any legal authority to impose the conservatorships, at the expense of the Companies' preferred and common shareholders.

88.     Notably, when asked how he allegedly persuaded the boards of Fannie Mae and Freddie Mac to consent to the conservatorships, Secretary Paulson stated that the boards were made by him, Director Lockhart, and Chairman Bernanke to understand that the decision was not just about the Companies' needs, rather it "goes beyond their individual situations" because "this is about our capital markets, this is about the economy."

89.     In short, the Government – through threats, misrepresentations, and undue pressure – coerced the Companies' directors to breach their fiduciary duties to their shareholders so that the Government could take control of the Companies and further its public policy goals. Any purported consent given by any of the Companies' directors to the imposition of the conservatorships was thus improperly given and invalid.

90.     Thus, none of twelve grounds for appointing the FHFA as conservator set forth in section 4617(a)(3)(I) was satisfied with respect to either Fannie Mae or Freddie Mac.

### 3. None of the Criteria Under HERA for Appointing a Conservator Was Properly Satisfied

91.     In total, HERA provided for 12 circumstances in which the FHFA could place the Companies into receivership or conservatorship:

A.    if a Company's assets were insufficient to meet its obligations;

B.    if a Company's assets or earnings were substantially dissipated due to unlawful conduct or unsafe or unsound practices;

C.    if a Company was in an unsafe or unsound condition to transact business;

D.    if a Company willfully violated a cease and desist order;

E.    if a Company concealed books and records from the FHFA Director;

F.    if a Company became unlikely to be able to pay its obligations or meet the demands of its creditors in the normal course of business;

G.    if a Company incurred, or became likely to incur, losses that would deplete substantially all of its capital with no reasonable prospect of becoming adequately capitalized;

H.    if a Company violated the law;

I.    if a Company's board of directors or shareholders passed a resolution consenting to a conservatorship or receivership;

J.    if a Company became undercapitalized or significantly undercapitalized, as defined by the governing statute, and could not or would not take corrective measures;

K.    if a Company became critically undercapitalized, as defined by the governing statute; or

L.    if a Company engaged in money laundering.

*See* 12 U.S.C. § 4617(a)(3)(A)-(L).

- 31 -

92.     As explained below, none of these statutory grounds existed with respect to either company.  Therefore, there was no legal basis for the Government to place the Companies into receivership or conservatorship.

### a.     The Companies' assets were significantly greater than their liabilities.

93.     Title 12, section 4617(a)(3)(A) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he assets of the regulated entity are less than the obligations of the regulated entity to its creditors and others."  Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

94.     As of June 30, 2008, the date of the most recently reported financial results for the last quarter immediately preceding Fannie Mae's conservatorship, which were not filed with the SEC until August 8, 2008, Fannie Mae had assets of $885.9 billion and liabilities of $844.5 billion.  Thus, Fannie Mae's assets exceeded its liabilities by more than $41 billion just shortly before the conservatorship was imposed.

95.     Indeed, at the time the conservatorship was imposed, Fannie Mae's assets had exceeded its liabilities by approximately $40 billion for each of the past three calendar years.  Specifically, Fannie Mae's assets exceeded its liabilities by about $40 billion, $41 billion, and $44 billion at the end of 2005, 2006, and 2007, respectively.

96.     Similarly, as of June 30, 2008, the date of the most recently reported financial results for the last quarter immediately preceding Freddie Mac's conservatorship, which were not filed with the SEC until August 6, 2008, Freddie Mac had assets of $879.0 billion and liabilities of $866.0 billion.  Thus, Freddie Mac's assets exceeded its liabilities by more than $23.0 billion just shortly before the conservatorship was imposed.

97.     At the time the conservatorship was imposed, Freddie Mac's assets had exceeded its liabilities by more than $26 billion for each of the past three calendar years.  Specifically, Freddie Mac's assets exceeded its liabilities by $28.1 billion, $28.8 billion, and $26.9 billion at the end of 2005, 2006, and 2007, respectively.

010347-11  615631V1

98.    Thus, no factual basis existed for asserting that the Companies' assets were less than their obligations and, therefore, the statutory ground for appointing a conservator set forth in section 4617(a)(3)(A) was not satisfied.

**b.     The Companies had not suffered a substantial dissipation of assets or earnings due to a violation of law or unsafe and unsound practices.**

99.    Title 12, section 4617(a)(3)(B) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when the entity experiences a "[s]ubstantial dissipation of assets or earnings due to: i) any violation of any provision of Federal or State law; or ii) any unsafe or unsound practice." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

100.    From December 31, 2005, to June 30, 2008, Fannie Mae's assets grew from $834.1 billion to $896.6 billion. Thus, the company's assets were increasing. Nor was there a substantial dissipation of Fannie Mae's earnings. Although Fannie Mae's earnings decreased from 2005 to 2007, they increased in the first half of 2008 over earnings in the second half of 2007.

101.    Further, Fannie Mae's decline in earnings in 2007 was not attributable to either a violation of law or to any unsafe and unsound practice. Rather, this decline was largely attributable to the following circumstances: a narrowing of the interest spread earned by Fannie Mae resulting from higher borrowing costs during a period of turmoil in the financial markets; the need to increase reserves to offset expected future credit losses stemming from the general decline in the housing market which was negatively impacting all financial institutions at the time; and discrete one-time losses on derivatives contracts with corresponding offsetting gains that were not simultaneously recognized. None of these circumstances reflected either a violation of law or an unsafe and unsound practice on the part of Fannie Mae.

102.    With regard to Freddie Mac, from December 31, 2005, to June 30, 2008, although the company's earnings declined, its assets grew from $798.6 billion to $879.0 billion. Thus, Freddie Mac's assets were increasing, not dissipating.

- 33 -

103.   The decline in Freddie Mac's earnings was not attributable to either a violation of law or to any unsafe and unsound practice.  Rather, this decline was largely attributable to the following circumstances:  a narrowing of the interest spread earned by Freddie Mac, resulting from higher borrowing costs during a period of turmoil in the financial markets; the need to increase reserves to offset anticipated expected future credit losses stemming from the general decline in the housing market which was negatively impacting all financial institutions at the time; and other factors arising from a general period of decline and higher risk in the market.  None of these circumstances reflected either a violation of law or an unsafe and unsound practice on the part of Freddie Mac.

104.   There has never been any allegation that the Companies engaged in a violation of any law resulting in the substantial dissipation of assets or earnings.  Neither company was engaging in any unsafe and unsound practice.  Indeed, in his September 7, 2008 public announcement of the appointment of the conservator, Director Lockhart strongly emphasized that the management and directors of the Companies had done nothing wrong, noting that any difficulties they were facing were the result of extenuating circumstances.  And in his September 7, 2008 public statement, Secretary Paulson stated that, "I attribute the need for today's action primarily to the inherent conflict and flawed business model embedded in the GSE structure, and to the ongoing housing correction.  [Fannie Mae's and Freddie Mac's] management and their Boards are responsible for neither."

105.   Accordingly, neither Fannie Mae nor Freddie Mac had experienced a substantial dissipation of assets and earnings caused by either a violation of law or an unsafe and unsound practice and, therefore, the ground for appointing a conservator set forth in section 4617(a)(3)(B) was not satisfied.

     **c.**     **Neither company was in an unsafe or unsound condition.**

106.   Title 12, section 4617(a)(3)(C) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when the entity is operating in "[a]n unsafe or

- 34 -

unsound condition to transact business." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

107.    Neither Fannie Mae nor Freddie Mac was engaged in any unsafe or unsound practice or was in danger of incurring losses that would cause their capital to fall below regulatory capital requirements. Moreover, the Companies had capital substantially in excess of their regulatory capital requirements. Accordingly, the Companies were not operating in an unsafe or unsound condition.

108.    The Companies were subject to capital requirements contained in HERA which, by definition, were engineered to ensure that the Companies remained in a safe and sound condition. To that end, HERA specifically provides that the risk-based capital requirement shall "ensure that the enterprises operate in a safe and sound manner, maintaining sufficient capital and reserves to support the risks that arise in the operations and management of [each] enterprise." As discussed in ¶¶ 109-12 and 141-45, *infra*, both of the Companies substantially exceeded the applicable risk-based requirements, and this had always been the case. Thus, by definition, the Companies were in a safe and sound condition.

109.    Further, one of the capital requirements applicable to the Companies was the requirement that they have "total capital" in excess of their "statutory risk-based capital level." "Total capital" is defined in a published regulation, as is "statutory risk-based capital level"; the latter is specifically crafted to ensure that the Companies remain in a safe and sound condition. Indeed, the 1992 Act imposing the risk-based capital level required OFHEO to identify a level of total capital by developing an extreme "stress test." This stress test, often referred to as the "100-year storm" test, required that the Companies' total capital was sufficient to withstand a 10-year period of extreme economic instability and adverse market conditions.

110.    As of June 30, 2008, Fannie Mae's core capital exceeded both the FHFA-directed and statutory minimum capital requirement and its total capital exceeded its required risk-based capital. As of June 30, 2008, Fannie Mae's core capital exceeded its statutory minimum capital requirement by $14.3 billion, or 43.9%, and its total capital exceeded its statutory risk-based

- 35 -

capital requirement by $19.3 billion, or 53.1%.  Likewise, as of March 30, 2008, the statutory risk-based capital level was $23 billion, and the company had total capital of $47.6 billion – *more than twice* the amount required to withstand the 100-year storm test.  Similarly, over the quarters immediately preceding the appointment of the conservator, Fannie Mae's total capital *increased* from $48.7 billion as of December 31, 2007, to $55.6 billion as of June 30, 2008.

111.    Freddie Mac's total capital has always substantially exceeded the extreme stress test imposed by the statutory risk-based capital requirement.  For example, as of March 30, 2008, the statutory risk-based capital level was $26.1 billion, and the company had total capital of $42.2 billion – *exceeding the requirement by $16.1 billion*.  And, over the quarters immediately preceding the appointment of the conservator, Freddie Mac's total capital *increased* from $40.9 billion as of December 31, 2007 (a surplus of $6.6 billion), to $46.6 billion as of June 30, 2008 (a surplus of $5.1 billion).  While HERA called for the FHFA to devise new risk-based capital requirements, the FHFA had not yet done so when the conservatorships were imposed on the Companies.  Regardless, the Companies would have passed any reasonable risk-based capital stress test that could have been applied at that time.

112.    Accordingly, the Companies were not operating in an unsafe or unsound condition and, therefore, the statutory ground for appointing a conservator set forth in section 4617(a)(3)(C) was not satisfied.

**d.     Neither company was in violation of any cease and desist order.**

113.    Title 12, section 4617(a)(3)(D) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when there is "[a]ny willful violation of a cease and desist order [by a GSE] that has become final."  Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

114.    Although a Consent Order was issued against Fannie Mae by OFHEO on May 23, 2006, Fannie Mae fully complied with it.  The Consent Order was lifted on May 6, 2008. Freddie Mac was not subject to any such Consent Order.

- 36 -

115.    Neither Fannie Mae nor Freddie Mac had been subject to any other cease and desist orders and, therefore, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(D) was not satisfied with respect to the Companies.

> **e.    Neither company concealed or refused to submit any books or records.**

116.    Title 12, section 4617(a)(3)(E) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when there is "[a]ny concealment of the books, papers, records, or assets of the regulated entity, or any refusal to submit the books, papers, records, or affairs of the regulated entity, for the inspection to any examiner or to any lawful agent of the Director." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

117.    Neither Fannie Mae nor Freddie Mac at any time concealed their books and records or refused to make their books and records available for inspection.

118.    Thus, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(E) was not satisfied with respect to the Companies.

> **f.    The Companies were able to pay their obligations and meet the demands of their creditors.**

119.    Title 12, section 4617(a)(3)(F) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity is likely to be unable to pay its obligations or meet the demands of its creditors in the normal course of business." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

120.    As of June 30, 2008, Fannie Mae had $344.8 billion of short-term assets, comprised chiefly of cash, cash equivalents, and investments in publicly traded securities. This far exceeded the company's $247.0 billion in short-term liabilities. Fannie Mae's holdings of investment securities were carried on the company's balance sheet on a fair value basis, and thus represented a market valuation for those assets.

- 37 -

121.    For the six months ending June 30, 2008, Fannie Mae generated net cash from its operating activities of $29.9 billion and had a net increase in cash and cash equivalents from all sources of $3.7 billion.

122.    As of June 30, 2008, Freddie Mac had $745.4 billion of short-term assets consisting of cash, cash equivalents, resale agreements or investments in securities, which greatly exceeded its $356.4 billion in short-term debt.

123.    Fannie Mae and Freddie Mac both had sufficient assets to meet their obligations and any demands of their creditors in the normal course of business.

124.    Thus, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(F) was not satisfied with respect to the Companies.

> **g.    Neither company incurred or was likely to incur losses that would deplete all or substantially all of its capital.**

125.    Title 12, section 4617(a)(3)(G) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and there is no reasonable prospect for the regulated entity to become adequately capitalized." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

126.    During the period leading up to the imposition of the conservatorship, neither Fannie Mae nor Freddie Mac incurred losses that substantially depleted their capital, let alone all of their capital.

127.    From December 31, 2007, to June 30, 2008, Fannie Mae's total capital increased from $48.7 billion to $55.6 billion, and its core capital increased from $45.4 billion to $47.0 billion. Thus, Fannie Mae's capital had not been depleted.

128.    Likewise, Freddie Mac's capital had not been depleted. From June 30, 2007, to June 30, 2008, Freddie Mac's core capital decreased only slightly from $37.9 billion to $37.1 billion. Thus, Freddie Mac's capital had not been depleted.

010347-11 615631V1

129.   The net losses recorded on Fannie Mae's income statement during the four quarters between June 30, 2007, and June 30, 2008 did not deplete the company's capital. Those losses primarily reflected the company's recording of substantial reserves for potential future credit losses. These losses are not actually realized until future periods (if they are ever realized at all), and they can be offset by correlating deferred tax assets that have a reasonable expectation of being realized in the future (based partly on a lengthy history of largely positive financial performance). Thus, they are added back into the calculation of total capital and do not actually impact total capital.

130.   Moreover, Fannie Mae had access to substantial capital in the public equity markets. From October 2007 through the imposition of the conservatorship, Fannie Mae raised more than $12 billion through issuances of its preferred stock. In December 2007, the company raised approximately $7 billion through an issuance of Series S preferred stock; in May 2008, Fannie Mae raised almost $2.1 billion through issuing Series 2008-1 preferred stock; and, also in May 2008, Fannie Mae raised an additional $2.25 billion by issuing Series T preferred stock. Fannie Mae also raised an additional $2.59 billion by issuing 94.3 million shares of common stock at a price of $27.5 per share in May 2008. The original 82 million-share offering was oversubscribed, and an additional 12.3 million shares were allocated to the underwriters.

131.   Freddie Mac was likewise able to obtain capital from the public equity markets. Specifically, Freddie Mac raised $500 million from an offering of Series Y preferred stock in September 2007, and $6.0 billion from an offering of Series Z preferred stock in December 2007.

132.   Thus, to the extent that either company had incurred net losses, those losses did not deplete either company's capital.

133.   Accordingly, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(G) was not satisfied with respect to the Companies.

**h.**   **Neither company violated any law or regulation, or engaged in any unsafe or unsound practice or condition that would likely cause insolvency, a substantial dissipation of assets or earnings, or a weakening of its condition.**

134.   Title 12, section 4617(a)(3)(H) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[a]ny violation of any law or regulation, or any unsafe or unsound practice or condition [] is likely to:  i) cause insolvency or substantial dissipation of assets or earnings; or ii) weaken the condition of the regulated entity."  Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

135.   Neither Fannie Mae nor Freddie Mac violated any law or regulation; nor did they engage in any unsafe or unsound practice or condition.  When the conservatorships were imposed, neither company was in any danger of becoming insolvent or incurring a substantial dissipation of assets or earnings, or falling into a weakened condition as the result of any violation of law or regulation or unsafe or unsound practice or condition.

136.   Accordingly, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(H) was not satisfied with respect to the Companies.

**i.**   **The Companies did not consent to the appointment of a conservator.**

137.   Title 12, section 4617(a)(3)(I) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity, by resolution of its board of directors or its shareholders or members, consents to the appointment."  Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

138.   Neither company's shareholders resolved to consent to a conservatorship.

139.   As discussed in Section V(E)(2), *supra*, any consent purportedly obtained by the Companies' boards of directors was coerced and/or otherwise improperly obtained, rendering any such consent invalid.

- 40 -

140.    Accordingly, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(I) was not satisfied with respect to the Companies.

### j.    Neither company was undercapitalized.

141.    Title 12, section 4617(a)(3)(J) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity is undercapitalized or significantly undercapitalized, and:  (i) has no reasonable prospect of becoming adequately capitalized; (ii) fails to become adequately capitalized, as required by:  (I) section 4615(a)(1) of this title with respect to a regulated entity; or (II) section 4616(a)(1) of this title with respect to a significantly undercapitalized entity; (iii) fails to submit a capital restoration plan acceptable to the Agency within the time prescribed under section 4622 of this title; or (iv) materially fails to implement a capital restoration plan submitted and accepted under section 4622 of this title." Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

142.    At all relevant times prior to and including the time the FHFA was appointed as conservator, the Companies were "adequately capitalized." To qualify as "adequately capitalized," a company is required to have:

    a.    "Total Capital" (as defined at 12 C.F.R. § 1750.11(n))
          equal to or in excess of its "Risk-Based Capital" (as defined
          at 12 U.S.C. § 4611(a)(1)); and

    b.    "Core Capital" (as defined at 12 C.F.R. § 1750.2) equal to
          or in excess of its "Minimum Capital" (as defined at 12
          C.F.R. § 1750.4).

143.    At the time the conservatorships were imposed, not only were the Companies adequately capitalized, as they met both of these requirements, but each company's capital was substantially *in excess* of its capital requirements.  Moreover, each company's ability to raise capital from the public equity and private capital markets was more than sufficient to allow it to absorb any potential future losses, particularly if the Companies had been allowed to offer terms to potential investors as favorable as those demanded by the Government in exchange for the

extremely costly capital it provided upon taking control of the Companies.  And the Companies always had more than sufficient assets and capital to satisfy all obligations to their creditors:

**Fannie Mae and Freddie Mac Core Capital and Total Capital**
**2001 Through June 2008**
**(in millions of dollars)**

|  | June 30 | As of Year End | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 |
| **Fannie Mae:** | | | | | | | | |
| Core Capital | 46,964 | 45,373 | 41,950 | 39,433 | 35,514 | 26,953 | 20,431 | 18,234 |
| Total Capital | 55,568 | 48,658 | 42,703 | 40,091 | 35,196 | 27,487 | 20,831 | 18,500 |
| | | | | | | | | |
| **Freddie Mac:** | | | | | | | | |
| Core Capital | 37,128 | 37,867 | 35,365 | 35,964 | 35,009 | 32,985 | 28,990 | 20,181 |
| Total Capital | n/a | 40,929 | 36,742 | 36,781 | 34,691 | 33,436 | 24,222 | 20,137 |

144.    Because Fannie Mae and Freddie Mac were more than adequately capitalized, as defined under law, they were not undercapitalized or significantly undercapitalized.  Therefore, the FHFA Director lacked any justification or legal authority to appoint a conservator for the Companies.

145.    In addition to the statutory capitalization requirements, Fannie Mae was, during parts of 2007 and 2008, subject to a consent order from OFHEO under which it was required to keep core capital at a level 30% higher than the minimum capital requirement.  This 30% requirement was lowered to 20% for the first quarter of 2008, and lowered again to 15% for the second quarter of 2008 in accordance with the provisions of the consent order.  Fannie Mae had sufficient surplus capital such that it was always in compliance with this additional capitalization requirement.

146.    As noted in ¶¶ 62-66, *supra*, in the months leading up to the decision to appoint the FHFA as conservator for Fannie Mae and Freddie Mac, the Companies' regulators repeatedly emphasized that the Companies were adequately capitalized.

- 42 -

147.    Moreover, even if one of the Companies was undercapitalized, Director Lockhart would have been required to provide the undercapitalized company an opportunity to submit and comply with a capital restoration plan, and to demonstrate that it could have raised private capital if and as needed.  Specifically, under 12 U.S.C. § 4615(a) (entitled "Mandatory actions"), as amended by HERA, "[t]he Director [of the FHFA] shall" impose on an undercapitalized regulated entity a capital restoration plan.  Had such a plan been required of either company, both Fannie Mae and Freddie Mac would have been capable of meeting such a requirement and, further, would have been able to raise additional capital from the private markets if and as needed.

148.    Accordingly, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(J) was not satisfied with respect to the Companies.

### k.    Neither company was critically undercapitalized.

149.    Title 12, section 4617(a)(3)(K) provides that the FHFA should be appointed conservator of Fannie Mae or Freddie Mac when "[t]he regulated entity is critically undercapitalized."  Neither of the Companies fell within the purview of this subsection at the time they were placed in conservatorship.

150.    As alleged above, at all relevant times, both Fannie Mae and Freddie Mac had total capital and core capital in excess of all applicable regulatory requirements.  Therefore, at all relevant times, neither Fannie Mae nor Freddie Mac was critically undercapitalized.

151.    As such, the ground for appointing the FHFA as conservator set forth in section 4617(a)(3)(K) was not satisfied with respect to the Companies.

### l.    Neither company was found guilty of money laundering.

152.    Title 12, section 4617(a)(3)(L) provides that the FHFA may be appointed conservator of Fannie Mae or Freddie Mac when "[t]he Attorney General notifies the Director in writing that the regulated entity has been found guilty of a criminal offense under section 1965 or

- 43 -

1957 of Title 18 or section 5322 or 5324 of Title 31." Neither of the Companies fell within the

purview of this subsection at the time they were placed in conservatorship.

153.    Neither Fannie Mae nor Freddie Mac was ever found guilty of any criminal

offense and, therefore, the statutory ground for appointing a conservator set forth in section

4617(a)(3)(L) was not satisfied with respect to the Companies.

**F.      The Stock Agreements Improperly Appropriated the Private Property of the Companies' Preferred and Common Shareholders**

**1.      The Original Stock Agreements**

154.    At the same time that the Companies were placed in conservatorship, the Director

of the FHFA, acting as conservator, and the Secretary of the Treasury entered into the Stock

Agreements dated September 7, 2008.  The Stock Agreements provided that, in exchange for

making available to each company a $100 billion line of credit – which neither company needed

or asked for – the Treasury would receive (a) $1 billion in senior preferred stock "for free,"

(b) additional senior preferred stock equal to the amount of any credit the Treasury extended to

the Companies, (c) preferential rights for the Treasury's senior preferred stock that placed it

ahead of all other stockholders, and (d) warrants to acquire 79.9% of each company's common

stock for one-thousandth of one cent per share, which translated to a total exercise price of

approximately $8,000 for each company.  The Stock Agreements were amended in May 2009 to

increase the line of credit to $200 billion for each company, and in December 2009 to make the

maximum line of credit based on a formula designed to cover quarterly deficits in net worth from

2010 to 2012, and then for future years subject to a cap.

155.    The Treasury claimed that its authority to enter into the Stock Agreements derived

from Section 304(g) of Fannie Mae's charter and Section 306(l) of Freddie Mac's charter,

substantially identical provisions added when Congress enacted HERA.  However, HERA did

not provide the Treasury with unilateral authority to enter into the Stock Agreements.  The

amended charters allowed the Treasury to purchase any obligations and other securities issued by

the Companies "on such terms and conditions as the Secretary may determine and in such

- 44 -

amounts as the Secretary may determine" if the Treasury determined doing so was necessary (i) to provide stability to the financial markets; (ii) to prevent disruptions in the availability of mortgage finance; and (iii) to protect the taxpayers. And, in order to do so, the Treasury had to obtain the consent of the Companies. As set in paragraphs 81-90 and 137-40, *supra*, the Treasury never obtained the Companies' consent; instead, the conservatorships and the Stock Agreements were improperly forced upon them.

156.    In addition, when the Treasury purchased securities from the Companies, it was required to take into consideration:

(i)     The need for preferences or priorities regarding payments to the government.

(ii)    Limits on maturity or disposition of obligations or securities to be purchased.

(iii)   The corporation's plan for the orderly resumption of private market funding or capital access.

(iv)    The probability of the corporation fulfilling the terms of any such obligation or other security, including repayment.

(v)     The need to maintain the corporation's status as a private shareholder-owned company.

(vi)    Restrictions on the use of corporation resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

157.    The Treasury did not consider most of these factors in imposing the Stock Agreements on the Companies. Instead, it forced them to pay tens of billions of dollars to the Treasury in exchange for capital infusions the Companies did not need or could have obtained from other sources under far less onerous terms. Indeed, since 2010, but for the dividends the Companies were required to pay the Treasury under the Stock Agreements, the Companies would not have needed the Treasury to provide additional capital by purchasing additional stock

- 45 -

at all.  In its 2011 Form 10-K, Fannie Mae reported that it did "not expect to earn profits in excess of [its] annual dividend obligation to Treasury for the indefinite future."

158.   In addition, despite the fact that the Treasury's authority to make purchases of the Companies' stock expired on December 31, 2009, the Treasury unilaterally extended that deadline indefinitely.

159.   The terms of the Stock Agreements clearly suggest that the intent of these agreements was to eventually put the Companies out of business.  When the conservatorships were first imposed, the FHFA stated that they were not intended to be permanent.  Acting Director DeMarco said that "[t]he statutory purpose of conservatorship is to preserve and conserve each Company's assets and put them in a sound and solvent condition.  The goals of conservatorship are to help restore confidence in the companies, enhance their capacity to fulfill their mission, and mitigate the systemic risk that contributed directly to instability in financial markets."  Despite these assurances, the Stock Agreements not only failed to consider how the Companies could return to private corporations, they ensured that the Companies could never again do so.  Instead, the Government used the Stock Agreements to ensure that the Companies' sole continuing purpose would be to pay the Treasury for the "right" to remove toxic assets from the books of other financial institutions by transferring them to the Companies' books using capital provided by the Treasury.  As Secretary Paulson explained on November 18, 2011, "we really need to use Fannie Mae and Freddie Mac to do anything that's reasonable to provide financial support to the mortgage market."

160.   Despite the Government's assurances that the conservatorships were not going to be permanent, the Government designed the Stock Agreements to provide a mechanism to wind down the Companies.  While this would leave the Companies' shareholders with nothing, by virtue of the liquidation preferences the Treasury received when it took the Companies' senior preferred stock, the FHFA's Office of Inspector General concluded that the Treasury would receive $189.5 billion as a result of the potential liquidation of the Companies.

- 46 -

## 2.     The Third Amendment

161.     The Treasury's purpose in entering into the Stock Agreements became even clearer in August 2012, when, after Fannie Mae and Freddie Mac had each once again achieved a positive net worth despite having been forced to pay tens of billions of dollars to the Treasury in dividends in exchange for capital infusions the Companies did not need, the Treasury amended the terms of the Stock Agreements.  Under the Third Amendment to each of the Stock Agreements (the "Third Amendment"), beginning in January 2013, the entire positive net worth of Fannie Mae and Freddie Mac, to extent that the Companies are generating a profit going forward, will be transferred to the Treasury on a quarterly basis, less a diminishing capital reserve requirement for the first five years following this change.  This Government action leaves no residual value for the Companies' shareholders, despite the fact that the Companies are once again very profitable.

162.     That the Government has received, and continues to receive, a windfall at the expense of Fannie Mae's and Freddie Mac's shareholders could not be clearer.  As reported in an April 10, 2013 *Wall Street Journal* article, the Companies paid the Treasury roughly $55.2 billion in dividends since the Conservatorships were imposed, through 2012.  Moreover, the Treasury has calculated that, between 2013 and 2023, the Companies will collectively pay an additional $183.3 billion in projected dividends.  The *Wall Street Journal* article also noted that the terms of the Stock Agreements "don't actually provide a mechanism for them to buy back the [senior] preferred shares that the government has taken.  In that sense, Fannie and Freddie are simply making interest payments on a loan that can't ever be paid off."  As such, this usurious "cash cow" arrangement, implemented under the conservatorships through the Stock Agreements and the Third Amendment, has provided the Government with an extremely generous source of funding by taking all the Companies' earnings, and thereby destroying the economic value of the rights and property interests of the Companies' common and preferred shareholders.

163.     The Companies' current, strong financial health is also beyond question.  Fannie Mae announced earnings of $17.2 billion in 2012, which included earnings of $7.6 billion in 4Q

2012 – the Company's "largest annual and quarterly net income in its 75-year history." Similarly, Freddie Mac announced a record-breaking $11 billion in profits for 2012. Indeed, in early May 2013, Freddie Mac announced that the first quarter of 2013 was the second best quarter in the Company's history with net income of $4.6 billion for the quarter. Likewise, Fannie Mae announced that it had earned a record $58.7 billion profit for the first quarter of 2013, including applicable tax credits.

164.    Two primary things have contributed to the Companies' renewed profitability. First, now that the Companies have been permitted to increase their guarantee fees – indeed, they have been required to do so under the Temporary Payroll Tax Cut Continuation Act – they have been able to further increase their revenue. In evaluating the Companies, analysts have noted that "[t]heir guarantee fee income is . . . at 'unprecedented rates,' and their default rates are at four year lows . . . ."

165.    Second, the Government's recently revised treatment of the Companies' deferred tax assets, the very same assets that it previously forced them to write down, has also contributed to the Companies' profitability, as well as the Government's ability to substantially reduce the federal deficit. As explained in an April 8, 2013 *Washington Post* article, the Companies had considered reversing close to $90 billion of tax credit writedowns, previously forced upon them by the Government in late 2008 after it took control of the Companies, an amount that now would flow conveniently to Treasury at a time when the Government is struggling to continue operations in the face of a looming debt ceiling. According to the *Washington Post* article, these writedowns, when combined with the Companies' strong earnings for the first quarter of 2013 would mean that the Companies' "June payments could about equal the $100 billion by which former Treasury secretary Timothy F. Geithner told Congress in December the U.S. debt grows on average each month." As one analyst commented, "[i]t could mean a pretty big chunk of cash for the Treasury at a time they need it[.]"

166.    Indeed, the fact that the Government was willing to make this change at a time in which it is in desperate need of revenue to meet its budget and debt obligations, but was not

- 48 -

willing to do so when it wanted to portray the Companies as being in a state of financial distress, underscores the degree to which any prior appearance of financial infirmity resulted largely from accounting manipulation by the Government upon the implementation of the conservatorships. As Treasury spokesman Anthony Coley told *The Washington Post*, Fannie Mae's potential large earnings are "an accounting issue between the company, its auditors and its regulator."

167.    In short, the Government is now reaping a fortune from its takeover of Fannie Mae and Freddie Mac.  Its artfully designed scheme to provide the Companies with capital from the Treasury to support the Government's public policy objectives in exchange for all their future profits, has taken all the rights and the economic value of their property interests away from the Companies' shareholders who have been left with virtually nothing.

168.    Although the Third Amendment has made the Government's expropriation of private property from the shareholders who own the Companies particularly clear, the terms of the original Stock Agreements were likewise designed to force Fannie Mae and Freddie Mac into a perpetual cycle whereby the Companies accepted additional funds from the Treasury just to pay the dividends owed on the funds the Treasury had previously funneled through them to provide a "backdoor" bailout of other financial institutions and unprecedented levels of liquidity to the mortgage market.  This arrangement was created and imposed by the Government to allow it to benefit as much as possible from the usurious scheme it had forced on the Companies, while also achieving its public policy objectives, under the guise of the conservatorships.

169.    Once it became clear, however, that the Companies might be sufficiently profitable to generate earnings beyond what was owed to the Treasury in dividends, despite the extremely onerous provisions of the original Stock Agreements, the Government conveniently amended the terms of the Stock Agreements to ensure that ***all of the Companies' profits would be unquestionably transferred to the Treasury going forward***.  By design, the original Stock Agreements were orchestrated to preclude the Companies' outstanding public shareholders from receiving any value indefinitely, but the Third Amendment has further streamlined and finalized that process, forcing Fannie Mae and Freddie Mac to completely and fully transfer any

- 49 -

remaining economic value from their shareholders to the Treasury, guaranteeing that the shareholders are left with nothing.

## VI.   THE GOVERNMENT'S CONDUCT CONSTITUTED AN ILLEGAL EXACTION AND/OR TAKING WITHOUT JUST COMPENSATION IN VIOLATION OF THE U.S. CONSTITUTION

170.   The following Government actions, made with respect to the Companies, constituted an illegal exaction and/or taking:  (a) imposing the conservatorships upon the Companies causing the value of the Companies' shares to plummet, thus destroying shareholder rights and value; (b) imposing the usurious terms of the Stock Agreements on the Companies and taking warrants for 79.9% of the common stock at a nominal exercise price, thereby further diluting shareholder value; (c) dissipating the assets of the Companies during the conservatorships by forcing them to assume and guarantee large amounts of toxic debt, increase their loan loss reserves, and write down the value of their deferred tax assets; and (d) subsequently changing the terms of the Stock Agreements through the Third Amendment to more fully ensure a "net worth sweep" and take any remaining value away from the Companies' shareholders.

## A.   The Government Disregarded the Rights and Property Interests of the Companies' Shareholders in Taking Control of the Companies, Saddling Them With the Oppressive Stock Agreements, and Dissipating Their Assets to Achieve Its Public Policy Objectives.

171.   In taking control of the Companies away from their shareholders by imposing the conservatorships upon them, forcing the Companies to issue senior preferred stock to the Treasury under the usurious, unilaterally imposed terms of the Stock Agreements, as subsequently amended, taking a right to a 79.9% share of the Companies for a nominal exercise price, and dissipating their assets to further its own public policy objectives, the Government completely disregarded the rights and ownership interests of the Companies' shareholders.  Nor did the Government provide those shareholders with any compensation – much less just compensation – for the property rights and interests that were taken from them.  Instead, the

- 50 -

Government's operation of the conservatorships made it virtually impossible for the Companies to regain their status as private, shareholder-controlled corporations.

1.    **Plaintiffs Had a Property Interest in the Economic Value Associated with Their Shares of Fannie Mae and Freddie Mac Common and Preferred Stock.**

172.    Fannie Mae had 1,076,207,174 shares of common stock outstanding as of both June 30, 2008, and September 30, 2008, and presumably on the date of the conservatorship. Fannie Mae common shares traded at over $30 per share during 2008, including closing trading at $7.04 per share on September 5, 2008 (the last trading day prior to the conservatorship).  On September 8, 2008, immediately following the announcement of the conservatorship, Fannie Mae common shares closed trading at just $0.73 per share.  As of May 3, 2013, Fannie Mae shares closed trading at $0.82 per share.

173.    Freddie Mac had 647,015,161 shares of common stock outstanding as of July 28, 2008, and 647,158,633 shares of common stock outstanding as of November 10, 2008.  Freddie Mac shares traded above $25 per share during 2008, and closed trading on September 5, 2008 (the last day of trading prior to the conservatorship) at $5.10 per share.  On September 8, 2008, immediately following the conservatorship, Freddie Mac common shares closed trading at just $0.88 per share.  As of May 3, 2013, Freddie Mac shares closed trading at $0.82 per share.

174.    At the time of the conservatorships, Fannie Mae had roughly $21 billion in total redemption value of preferred shares outstanding, and Freddie Mac had roughly $14 billion in total redemption value of preferred shares outstanding.  The value of each of these shares declined dramatically upon the announcement of the conservatorships and the enactment of the Stock Agreements on September 7, 2008, as shown in the following charts:

010347-11 615631V1

**Fannie Mae Changes in Preferred Share Prices**

| | | Share Price | |
|:---:|:---:|:---:|:---:|
| Series | CUSIP | 5-Sep-08 | 8-Sep-08 |
| D | 313586505 | Not Available | Not Available |
| E | 313586604 | 19.20 | 7.00 |
| F | 313586703 | 11.70 | 3.25 |
| G | 313586802 | 12.57 | 3.05 |
| H | 313586885 | 19.45 | 3.70 |
| I | 313586877 | 18.80 | 3.50 |
| L | 313586844 | 18.63 | 3.40 |
| M | 313586836 | 17.66 | 3.50 |
| N | 313586828 | 19.83 | 3.65 |
| O | 313586794 | 21.50 | 3.57 |
| 2004-1 | 313586810 | 35,000.00 | 7,950.00 |
| P | 313586786 | 8.52 | 2.01 |
| Q | 313586778 | 11.85 | 2.26 |
| R | 313586760 | 13.37 | 2.70 |
| S | 313586752 | 14.00 | 3.42 |
| 2008-1 | 313586745 | 17.56 | 1.45 |
| T | 313586737 | 13.70 | 3.00 |

**Freddie Mac Changes in Preferred Share Prices**

| | | Share Price | |
|:---:|:---:|:---:|:---:|
| Series | CUSIP | 5-Sep-08 | 8-Sep-08 |
| B | 313400608 | 12.75 | 2.50 |
| Not Listed | 313400889 | 21.375 | 1.00 |
| F | 313400863 | 16.05 | 2.80 |
| G | 313400848 | 12.71 | 2.50 |
| H | 313400855 | 16.85 | 2.55 |
| Not Listed | 313400822 | 14.00 | 2.00 |
| Not Listed | 313400814 | 15.95 | 16.00 |
| K | 313400830 | 19.50 | 2.65 |
| L | 313400798 | 10.80 | 3.50 |
| M | 313400780 | 15.75 | 3.05 |
| N | 313400764 | 14.00 | 4.75 |
| O | 313400772 | 19.05 | 3.09 |
| P | 313400749 | 21.00 | 3.50 |
| Q | 313400756 | 13.80 | 2.50 |
| R | 313400731 | 18.55 | 3.00 |
| Not Listed | 313400723 | Not Available | Not Available |
| S | 313400715 | 14.25 | 3.00 |

- 52 -

| T | 313400699 | 21.05 | 3.02 |
| U | 313400681 | 10.50 | 1.71 |
| V | 313400673 | 9.15 | 1.71 |
| W | 313400665 | 9.29 | 1.83 |
| X | 313400657 | 14.05 | 2.02 |
| Y | 313400640 | 10.90 | 1.90 |
| Z | 313400624 | 13.56 | 2.87 |

2.    **Plaintiffs had a Reasonable Investment-backed Expectation that the Government Would Not Appropriate Shareholder Value and Rights in the Companies**

175.    The Companies' shareholders had a reasonable investment-backed expectation that the Government would not take their private property rights and interests without just compensation.

176.    Since 1968, Fannie Mae had been owned and controlled by private shareholders and publicly traded on the New York Stock Exchange. Similarly, since 1984, Freddie Mac had been owned and controlled by private shareholders and publicly traded on the New York Stock Exchange. Although the Companies were charged with a public mission under their charters, they operated successfully for decades, raising capital from investors through the public equity and private capital markets, generating profits and increasing shareholder value, much like any other publicly traded, shareholder-owned company.

177.    As with any other publicly traded company, the owners of Fannie Mae and Freddie Mac stock were vested with specific rights attendant to their ownership. These rights were specifically enumerated in by-laws and the prospectuses and registration statements for each of the Companies' common stock and series of preferred stock. Private investors long considered Fannie Mae and Freddie Mac securities to be popular, sound, conservative investments. The popularity, transferability and soundness of the Companies' stock, prior to the conservatorships, were clearly evidenced by, among other factors, the extent to which these shares were traded on the open market. For example, during the three years before Fannie Mae was placed into conservatorship, *i.e.,* from September 5, 2005, through September 5, 2008, Fannie Mae's common stock had an average daily trading volume of more than 13 million

shares.  Likewise, during that same time-period, Freddie Mac's common stock had an average daily trading volume of more than 12 million shares.

178.    Under the 1992 Act, absent an egregious refusal to accede to OFHEO directives, or the willing consent to a conservatorship by the Companies' boards of directors or their shareholders, the only justification for imposing a conservatorship over the Companies would stem from a condition of financial distress.  This draconian measure had never been used, not even during the financial accounting scandals that plagued the companies in the mid-2000s.  In short, there was no reason to believe that there would ever be a reason to impose a conservatorship over the Companies and, in the unlikely event that one was implemented over either of the Companies, their investors had a reasonable expectation that any such conservatorship would be used to protect and preserve the Companies' assets, as this statutory provision was designed to ensure.

179.    After 16 years of having the 1992 Act on the books, the new statute that was passed in July 2008 significantly increased the powers of the Government over the Companies, well beyond the regulatory powers that existed under the prior statute that was in place when the vast majority of the Companies' shareholders purchased their common and preferred stock. Although members of Congress and other Government officials, upon passage of HERA, strongly indicated that they never anticipated that these new powers, which Treasury Secretary Paulson referred to as a "bazooka," would need to be exercised, the Government invoked this "bazooka" a mere ten weeks after its passage.  The Government then used the conservatorships to terminate the rights of the Companies' shareholders, force the Companies to execute the Stock Agreements and subsequent amendments, provide large amounts of additional liquidity to the mortgage market using capital provided by the Treasury under a predatory lending arrangement, at great detriment to the Companies and their shareholders, and ensure that all the Companies' future profits would be transferred directly to the Government.  Plaintiffs and the members of the Classes had no reasonable expectation that the Government would impose these conservatorships and use them for these purposes, based on purported capitalization concerns that didn't exist,

- 54 -

especially when the Government had so often assured the public of the Companies' solvency, even weeks before the imposition of the conservatorships, and especially when it didn't do so following the Companies' 2003-2006 accounting scandals, which resulted in the restatement of billions of dollars in earnings and the payment of hundreds of millions of dollars in penalties.

180. Plaintiffs and the members of the Classes likewise had no reasonable expectation that the Treasury would abuse its power by forcing the Companies to enter into the Stock Agreements and amendments thereto. The Treasury did not seek or obtain the Companies' consent to sign those agreements; instead, it gave the Companies the Hobson's choice of either "agreeing" to them voluntarily or having them imposed by force. Moreover, in drafting the terms of the Stock Agreements, the Treasury failed to take into consideration factors required by the Companies' charters. The Treasury likewise unlawfully extended the duration of the Stock Agreements years beyond the 2009 limitation required by law. While HERA contemplated a conservatorship designed to return the Companies to financial health, the Government used the conservatorships to support the economy at unprecendented levels by forcing the Companies to assume the liabilities of other institutions and provide increased liquidity to the mortgage market. Although this action was taken for a laudable public benefit, it required the payment of just compensation to the shareholders of the Companies who suffered the nearly complete destruction of the value of their private property interests.

181. Moreover, none of the conditions required under HERA for the imposition of a conservatorship existed. The Companies were adequately capitalized and representatives from the Treasury, the Federal Reserve, Congress, and the FHFA repeatedly represented this fact in the months and weeks leading to the Government's imposition of the conservatorships. Based on those representations, Plaintiffs and the members of the Classes were not and could not have been aware that the Government believed the conditions necessary to assert a conservatorship existed. Therefore, they could not have reasonably anticipated that the Government would impose the conservatorships in the first instance.

- 55 -

**B.     The Government's Conduct During the Conservatorship Dissipated the Assets of the Companies and Constituted a Taking**

182.    As described in Section V(E)(1)(c), *supra*, the Government pursued broad public policy goals that caused it to substantially harm the value of the Companies under its control, rather than operating the conservatorships in a manner designed to preserve and protect the value of the Companies as is the intended statutory purpose of the conservator.

183.    Specifically, rather than preserving and protecting the value of the Companies, the Government used them as a vehicle to restore investor confidence in the mortgage market by providing a mechanism for other financial institutions to unload their bad mortgage debts.  That Fannie Mae and Freddie Mac were seized purely to accomplish public policy goals could not be clearer.  According to statements in its Annual Reports since the imposition of its conservatorship, Fannie Mae alone "provided approximately $2.3 trillion in liquidity to the mortgage market in 2009 through 2011 through [its] purchases and guarantees of loans, which enabled homeowners to refinance 6.6 million mortgages, 1.9 million households to purchase a home, and financing for over 1.1 million units of multifamily housing."

184.    These purchases of toxic debt were financed through the expensive draws from the Treasury as defined in the Stock Agreements.  Through this strategy, the Government was able to get the toxic debt off the banks' balance sheets (thus supporting the economy by restoring investor confidence in the banks) and provide additional liquidity to the mortgage market at a time when other institutions were fleeing this industry, while forcing the Companies to finance the Government's objectives.  Not surprisingly, the Government-orchestrated acquisition of these toxic mortgages and mortgage-related securities by the Companies, through a usurious financing arrangement it forced upon them, caused a significant loss of economic value to their shareholders.

185.    The damage to Fannie Mae and Freddie Mac and, in turn, to their shareholders' interests was further exacerbated by the otherwise unwarranted accounting changes forced upon the Companies by the Government.  Specifically, by forcing the Companies to dramatically

- 56 -

increase their loan loss reserves, in large part to account for the assumption of additional toxic assets instructed by the Government, and write down the value of their deferred tax assets, the Government squandered the value of the Companies and, accordingly, the equity interests held by their shareholders, creating the false perception at the time that they were less adequately capitalized than was actually the case and thereby necessitating further draws from the Treasury.

186.    In short, the Government effectively nationalized the Companies to use them to facilitate its own public policy objectives, which benefited the general public by supporting the economy during a very difficult time, but destroyed shareholder value.  As noted in Fannie Mae's Form 10-K for the year ending December 31, 2011, issued under FHFA control, "[b]ecause we are in conservatorship, our common shareholders currently do not have the ability to elect directors or to vote on other matters.  The conservator eliminated common and preferred stock dividends (other than dividends on the senior preferred stock issued to Treasury) during the conservatorship, and *we are no longer managed with a strategy to maximize shareholder returns*."  (Emphasis added.0  Similarly, Freddie Mac disclosed in its 2011 Form 10-K that "[b]ecause we are in conservatorship, we are no longer managed with a strategy to maximize stockholder returns."

## C.    The August 2012 Amendment to the Stock Agreements Constituted a Taking of Private Property

187.    Pursuant to the August 2012 Third Amendment to the Stock Agreements, the Government changed the terms of the Stock Agreements to provide for a "net worth sweep" by creating a dividend obligation that encompasses *all* of the net worth of the Companies on a quarterly basis as of January 1, 2013.  There is a diminishing, modest capital reserve requirement that is backed out of this quarterly dividend obligation from January 1, 2013, through December 31, 2017, and thereafter the capital reserve amount is reduced to zero.  This means that 100% of the Companies' profits are now being transferred to the Government on a quarterly basis.  Accordingly, this Government action has further ensured that *there can be no distribution to*

- 57 -

*either the preferred or the common shareholders no matter how much net income the Companies earn.*

188.    Thus, as Fannie Mae and Freddie Mac continued to regain their profitability and generate more and more earnings, the Government realized that they were likely to start generating earnings beyond what was owed to the Treasury in dividends under the original terms of the Stock Agreements, and escape this vicious, predatory lending arrangement.  Recognizing that this would mean a loss of further revenue for the Government, at a time when it desparately needed additional revenue sources to address severe budgetary constraints, the Government conveniently amended the terms of the Stock Agreements to further ensure that all the Companies' profits would be transferred directly to the Treasury, regardless of how much they earned.  As such, the Third Amendment has streamlined the process by which the Government has forced Fannie Mae and Freddie Mac to transfer all their economic value from the Companies' shareholders to the Treasury, leaving the shareholders with nothing.  Accordingly, the Government has appropriated many billions of dollars' worth of private shareholder property, without providing any compensation for this action.

**D.    The Companies' Shareholders Have Lost Billions of Dollars as a Result of This Misconduct**

189.    Fannie Mae's preferred shares traded at approximately 3% to 14% of face redemption value on September 8, 2008 – the first day of trading after the imposition of the conservatorship, resulting in a loss of approximately $19.1 billion for preferred shareholders. Likewise, Fannie Mae's common shares dropped from $7.04 per share on September 5, 2008, to close at just $0.73 per share on September 8, 2008 – a loss of approximately $6.8 billion.  In total, Fannie Mae preferred and common shareholders lost more than $25.9 billion on the first trading day after the imposition of the conservatorship.

190.    Freddie Mac's preferred shares traded at approximately 2% to 16% of face redemption value on September 8, 2008 – the first day of trading after the imposition of the

conservatorship, resulting in a loss of approximately $12.9 billion for preferred shareholders. Likewise, Freddie Mac's common shares dropped from $5.10 per share on September 5, 2008, to close at just $0.88 per share on September 8, 2008 – a loss of approximately $2.7 billion on the first day of trading following the imposition of the conservatorship. In total, Freddie Mac preferred and common shareholders lost more than $15.6 billion on the first trading day after the iumposition of the conservatorship.

191. In total, preferred and common shareholders of the two companies suffered a loss in value of more than $41 billion from the day prior to the first trading day immediately following the imposition of the conservatorship.

## VII. CLASS ALLEGATIONS

192. Pursuant to Rule 23: (A) with respect to Fannie Mae (1) Plaintiff City of Austin Police Retirement System brings this action on behalf of all persons or entities who held shares of Fannie Mae common stock on or before September 5, 2008, and (2) Plaintiffs Washington Federal and Michael McCredy Baker bring this action on behalf of all persons or entities who held shares of Fannie Mae preferred stock on or before September 5, 2008; and (B) with respect to Freddie Mac (1) Plaintiff City of Austin Police Retirement System brings this action on behalf of all persons or entities who held shares of Freddie Mac common stock on or before September 5, 2008, and (2) Plaintiffs Washington Federal and Michael McCredy Baker bring this action on behalf of all persons or entities who held shares of Freddie Mac preferred stock on or before September 5, 2008. Excluded from the Classes are Defendant and any agencies or political appointees thereof.

193. The requirements of Rule 23(a) are satisfied.

194. The members of each Class are sufficiently numerous that joinder of all members is impracticable. As of September 2008, Fannie Mae had outstanding approximately 1 billion shares of common stock and approximately 597 million shares of preferred stock (with a total redemption value of approximately $21 billion). Freddie Mac had approximately 650 million

- 59 -

shares of common stock outstanding and approximately 464 million shares of preferred stock (with a total redemption value of approximately $14 billion) outstanding.  The exact number of Class members is unknown by Plaintiffs at this time and can only be ascertained by the books and records of Fannie Mae and Freddie Mac and their transfer agents.

195.    Common questions of law and fact exist as to all Class members.  These questions likewise predominate over individual questions unique to any Class member.  Such common questions include:

(a)    Whether the Government had a legal basis to appropriate Class members' property;

(b)    Whether the Government, in fact, appropriated Class members' property without just compensation in violation of the Constitution;

(c)    Whether the Government illegally exacted Class members' property;

(d)    Whether the Government's appropriation and subsequent control of the Companies was exercised in a manner that deprived Class members of Due Process in violation of the Constitution; and

(e)    Whether Plaintiffs and the Classes are entitled to just compensation for the Government's taking and/or illegal exaction of their property rights, and if so the amount of such compensation.

196.    Plaintiffs' claims are typical of those of other Class members.  The Government's actions have impacted Class members equally because they were directed at all the Companies' common and preferred shareholders as a whole.  Accordingly, Plaintiffs' claims based on the conduct alleged herein are identical to those of other Class members.

197.    Plaintiffs will fairly and adequately represent the interests of Class members. There are no conflicts between Plaintiffs and the members of the Classes.  Plaintiffs have retained counsel experienced in the prosecution of complex litigation and commercial class actions who have sufficient resources and are ready, willing and able to litigate this action vigorously to its conclusion.

- 60 -

198.    The requirements of Rule 23(b)(3) are also satisfied.

199.    Common questions of law and fact predominate over any questions related to any individual Class member and a class action is a superior vehicle to litigate this action.  No Class members have an interest that would necessitate the prosecution of separate actions; Plaintiffs are not aware of any litigation concerning the matters alleged herein already brought by Class members; and Plaintiffs do not anticipate any difficulties in managing this case as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT ONE
### (ILLEGAL TAKING AND/OR EXACTION
### IN VIOLATION OF THE UNITED STATES CONSTITUTION)

200.    Plaintiffs incorporate by reference and reallege each and every allegation of the preceding paragraphs, as though fully set forth herein.

201.    In imposing the unprecedented conservatorships over the Companies and in taking and/or illegally exacting more than 1 billion shares of the common stock and approximately 597 million shares of the preferred stock of Fannie Mae (with a redemption value of approximately $21 billion) and approximately 650 million shares of the common stock and approximately 464.1 million shares of the preferred stock of Freddie Mac (with a redemption value of approximately $14 billion) without just compensation, the Government destroyed the rights and value of the property interests tied to the common and preferred stock of the Companies held by Plaintiffs and the Classes, nullified their reasonable, investment-backed expectations, and violated the fundamental principles of the Due Process and Takings Clauses of the Constitution.

202.    In taking private property, the Government is required to adhere to due process of law and to respect the legal rights of affected parties.

203.    The Government violated the statutory, contractual, and Constitutional rights of Plaintiffs and the Classes in taking and/or illegally exacting virtually all the value of the above

- 61 -

referenced common and preferred shares of both Fannie Mae and Freddie Mac that they owned, without providing just compensation.

204.    HERA did not authorize the Government to assert a conservatorship over Fannie Mae or Freddie Mac at the time the conservatorships were imposed.

205.    To the extent HERA authorized the conservatorships in the first instance, the Government exceeded its authority as conservator under HERA by forcing the Companies to assume large amounts of additional subprime assets and guarantee additional toxic assets, while capping the amount of guarantee fees they could charge and forcing them to execute the Stock Agreements and the amendments thereto which created a predatory lending arrangement with the Treasury and siphoned off billions of dollars from the Companies and ultimately transferred virtually all of the value of the Companies' equity from the common and preferred shareholders to the Government, as their shares were delisted and shareholder meetings were abolished.

206.    As described herein, the Government destroyed the value of the stock held by Plaintiffs and members of the Classes, nullified their reasonable, investment-backed expectations, and violated the fundamental principles of the Due Process and Takings Clauses of the Constitution.  The Government took and/or exacted the property and property rights of the Companies' shareholders to improperly and impermissibly benefit private parties and interests in at least the following manners:

a.    By causing the Companies to assume a significantly increased level of risky mortgages and mortgage-related assets prior to the conservatorship, thus leading to greatly diminished net worth and capital of the Companies;

b.    By improperly imposing the Stock Agreements and conservatorships over the Companies;

c.    By forcing the Companies to assume the toxic assets of other financial institutions following the conservatorships, thus engaging in a backdoor bailout of those other financial institutions and lowering the equity value of the Companies; and

d.    By improperly taking all of the net worth of the Companies.

- 62 -

207.    Even when the Government takes or illegally exacts private property to serve public purposes, the Constitution requires the payment of "just compensation."

208.    The Government did not pay just compensation to Fannie Mae common and preferred stock shareholders or Freddie Mac common and preferred stock shareholders for the taking and/or illegal exaction of the value of their equity interests in the Companies.  The Government's actions required it to pay just compensation to the Plaintiffs and members of the Classes under the Takings Clause of the Constitution.

209.    The Due Process and Takings Clauses of the Constitution protect shareholders from having their property and property rights taken and/or illegally exacted without just compensation.  As a direct result of the Government's violations of the Constitution, Plaintiffs and the Classes were injured, including monetary damage, as a direct and proximate cause of the Government's taking and/or illegal exaction of billions of dollars of property interests associated with their holdings of Fannie Mae common and preferred stock and Freddie Mac common and preferred stock.  The Government is liable to Plaintiffs and the Classes for the injury it caused.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs Washington Federal, Michael McCredy Baker, and City of Austin Police Retirement System demand judgment in their favor and in favor of the Classes against Defendant, the United States of America, as follows:

A.      Determining that this action may be maintained as a class action;

B.      Certifying Classes of, (A) for Fannie Mae (1) all persons or entities who held shares of Fannie Mae common stock on or before September 5, 2008, and (2) all persons or entities who held shares of Fannie Mae preferred stock on or before September 5, 2008; and, (B) for Freddie Mac (1) all persons or entities who held shares of Freddie Mac common stock on or before September 5, 2008, and (2) all persons or entities who held shares of Freddie Mac preferred stock on or before September 5, 2008.

- 63 -

C.      Finding that Plaintiffs have met the requirements of a class representative and may maintain this action as representatives of the Classes;

D.      Finding that the Defendant has taken and/or illegally exacted Plaintiffs' and the Classes private property in violation of the Due Process and Takings Clauses of the Constitution;

E.      Determining and awarding Plaintiffs and the Classes damages suffered by them by virtue of the Defendant's taking and/or illegal exaction in the amount of $41 billion, or some other amount to be determined at trial;

F.      Prejudgment and post-judgment interest, together with any and all further costs, disbursements and reasonable attorneys' and experts' fees;

G.      Granting all other relief as this Court may deem just and appropriate.

010347-11 615631V1

DATED:  June 7, 2013

By _____

Steve W. Berman
Attorney of Record
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-mail:  steve@hbsslaw.com

OF COUNSEL:

Jennifer Fountain Connolly
HAGENS BERMAN SOBOL SHAPIRO LLP
1629 K St. NW, Suite 300
Washington, D.C.  20006
Telephone:  (202) 355-6435
Facsimile:  (202) 355-6455
E-mail:  jenniferc@hbsslaw.com

Robert M. Roseman
James E. McGovern
Joshua B. Kaplan
SPECTOR ROSEMAN KODROFF & WILLIS, PC
1818 Market Street, Suite 2500
Philadelphia, Pennsylvania 19103
Telephone:  (215) 496-0300
Facsimile:  (215) 496-6611
E-mail:  rroseman@srkw-law.com
E-mail:  jmcgovern@srkw-law.com
E-mail:  jkaplan@srkw-law.com

*Attorneys for Plaintiffs Washington Federal,
Michael McCredy Baker, and City of Austin Police
Retirement System*