# In the United States Court of Federal Claims

No. 13-385C
(Filed Under Seal:  July 9, 2020)
(Reissued for Publication:  July 16, 2020)*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| WASHINGTON FEDERAL et al., | * | |
| | * | |
| Plaintiffs, | * | Motion to Dismiss; RCFC 12(b)(1); RCFC |
| | * | 12(b)(6); Jurisdiction; Standing; Direct |
| v. | * | Claims; Conservators; Shareholders; |
| | * | Fannie; Freddie; FHFA |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Steve W. Berman, Seattle, WA, for plaintiffs.

Kenneth M. Dintzer, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY,** Chief Judge

      Plaintiffs in this case challenge the imposition by the United States of conservatorships on the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie").  Plaintiffs also take issue with the conditions of the conservatorships for Fannie and Freddie (collectively, the "Enterprises"), such as the initial and amended funding agreements between the Enterprises and the United States Department of the Treasury ("Treasury").  Plaintiffs seek the return of money illegally exacted and just compensation for their takings claim pursuant to the Fifth Amendment to the United States Constitution ("Constitution").  Defendant moves to dismiss plaintiffs' complaint, arguing that the court lacks subject-matter jurisdiction over plaintiffs' claims, plaintiffs lack standing to pursue their claims, and plaintiffs fail to state a claim upon which relief may be granted.  For the reasons stated below, the court grants defendant's motion to dismiss.

---

      * The court initially issued this Opinion and Order under seal with instructions for the parties to propose any redactions.  The parties informed the court that no redactions were necessary to the Opinion and Order.

# I. BACKGROUND

**A. The Enterprises are private companies that are under the control of a conservator.**

## 1. The Enterprises operated independently before the financial crisis.

Congress created the Enterprises to help the housing market; the Enterprises purchase and guarantee mortgages originated by private banks before bundling those mortgages into securities that are sold to investors.[1]  1st Am. Compl. ¶¶ 25, 27, 29.  Congress chartered Fannie in 1938 and established Freddie in 1970.  Id. ¶¶ 25, 27.  Both Enterprises were initially part of the federal government before Congress reorganized them into for-profit companies owned by private shareholders.  Id.  Freddie is organized under Virginia law, and Fannie is organized under Delaware law.  Fairholme II, 147 Fed. Cl. at 15.  The Enterprises, consistent with the applicable state laws, issued their own common and preferred stock.  Id.; 1st Am. Compl. ¶¶ 26, 28.  Common shareholders obtained the right to receive dividends, collect any residual value, and vote on various corporate matters.  Fairholme II, 147 Fed. Cl. at 15; 1st Am. Compl. ¶ 31.  Those owning preferred stock acquired the right to receive dividends and a liquidation preference.  Fairholme II, 147 Fed. Cl. at 15; 1st Am. Compl. ¶¶ 32-33.

The Enterprises, up until the financial crisis in the late 2000s, were consistently profitable; Fannie had not reported a full-year loss since 1985, and Freddie had not reported such a loss since becoming privately owned.  Fairholme II, 147 Fed. Cl. at 15; 1st Am. Compl. ¶¶ 1-2.  Although the Enterprises recorded losses in 2007 and the first two quarters of 2008, the Enterprises continued to generate sufficient cash to pay their debts and retained sufficient capital to operate.  Fairholme II, 147 Fed. Cl. at 15; 1st Am. Compl. ¶¶ 104-105, 121-122.  Otherwise stated, the Enterprises were not in any apparent financial distress or otherwise at risk of insolvency.  1st Am. Compl. ¶¶ 115, 130.

## 2. Congress created the Federal Housing Finance Agency to regulate the Enterprises and authorized the agency to serve as a conservator for each Enterprise.

In the midst of the financial crisis during the summer of 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified as amended in scattered sections of 12 U.S.C.).  In that statute, Congress created the Federal Housing Finance Agency ("FHFA") and provided it with supervisory and regulatory authority over the Enterprises.  See 12 U.S.C. § 4511(a)-(b) (2018).[2]  Congress further authorized the FHFA Director to, in limited circumstances, appoint the FHFA as the conservator

---

[1]  This background section is a less comprehensive version of the court's recitation of facts in a related case, Fairholme Funds, Inc. v. United States, 147 Fed. Cl. 1 (2019) ("Fairholme II"), interlocutory appeals docketed, Nos. 20-121, 20-122 (Fed. Cir. June 18, 2020).

[2]  Congress has not amended the relevant portions of HERA since enacting the law in 2008.  The court, therefore, refers to the most recent version of the United States Code.

("FHFA-C") for each Enterprise to reorganize, rehabilitate, or wind up its affairs.[3]  Id. § 4617(a)(2).  Specifically, the Director is authorized to appoint a conservator if, among other things, an Enterprise consents, is undercapitalized, or lacks sufficient assets to pay its obligations.  Id. § 4617(a)(3).[4]  The conservator, once appointed, functions independently; it is not "subject to the direction or supervision of any other agency of the United States or any State in the exercise of [its] rights, powers, and privileges . . . ."  Id. § 4617(a)(7).

Congress also delineated the scope of the FHFA-C's powers in HERA.  See generally id. § 4617.  As soon as it is appointed, the FHFA-C "immediately succeed[s] to . . . all rights, titles, powers, and privileges of the [Enterprise], and of any stockholder, officer, or director of such [Enterprise] with respect to the [Enterprise] and the assets of the [Enterprise] . . . ."  Id. § 4617(b)(2)(A).  Congress also conferred the conservator with the power to "[o]perate the [Enterprise]."  Id. § 4617(b)(2)(B).  Pursuant to that power, the conservator "may," among other things, "perform all functions of the [Enterprise]," "preserve and conserve the assets and property of the [Enterprise]," and "provide by contract for assistance in fulfilling any function . . . of the [conservator]."  Id.  The conservator "may" also "take such action as may be . . . necessary to put the [Enterprise] in a sound and solvent condition; . . . and appropriate to carry on the business of the [Enterprise] and preserve and conserve the assets and property of the [Enterprise]."  Id. § 4617(b)(2)(D).  Rounding out the panoply of powers, Congress also provided that the conservator "may . . . exercise . . . such incidental powers as shall be necessary to carry out [its enumerated powers]" and "take any action authorized by [12 U.S.C. § 4617(b)], which [it] determines is in the best interest of the [Enterprise] or the [FHFA]."  Id. § 4617(b)(2)(J).  By describing the FHFA-C's role primarily in terms of what powers it "may" exercise, see generally id. § 4617, Congress provided the FHFA-C with significant discretion on when or how it uses its powers, see United States v. Rodgers, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion.").  Simply stated, the FHFA has "extraordinarily broad flexibility to carry out its role as conservator."  Perry Capital LLC v. Mnuchin, 864 F.3d 591, 606 (D.C. Cir. 2017) ("Perry II"), cert. denied, 138 S. Ct. 978 (2018).

### 3. Congress authorized Treasury to purchase securities issued by the Enterprises.

At the same time that it established the FHFA, Congress authorized the Treasury Secretary to buy securities issued by the Enterprises in limited circumstances.  12 U.S.C. §§ 1455(l) (Freddie), 1719(g) (Fannie).  Congress included a sunset clause on this power; the Secretary could not purchase securities after December 31, 2009.  Id. §§ 1455(l)(4), 1719(g)(4).  Until that date, the Secretary was permitted to purchase the securities if he determined that doing so was necessary to provide stability to the financial markets, prevent disruptions in the

---

[3]  To avoid any ambiguity, the court reiterates that it is using "FHFA" to refer to the agency acting in its regulatory role and "FHFA-C" when discussing the agency acting as a conservator.

[4]  Congress enticed the Enterprises to consent to a conservatorship by insulating their board members from any liability to shareholders or creditors for agreeing in good faith to the FHFA's appointment of a conservator.  12 U.S.C. § 4617(a)(6).

availability of mortgage finance, and protect taxpayers.  Id. §§ 1455(*l*)(1)(B), 1719(g)(1)(B).  As part of his obligation to protect taxpayers, the Secretary could only purchase securities after considering:

> (i)  The need for preferences or priorities regarding payments to the Government.

> (ii)  Limits on maturity or disposition of obligations or securities to be purchased.

> (iii)  The [Enterprise's] plan for the orderly resumption of private market funding or capital market access.

> (iv)  The probability of the [Enterprise] fulfilling the terms of any such obligation or other security, including repayment.

> (v)  The need to maintain the [Enterprise's] status as a private shareholder-owned company.

> (vi)  Restrictions on the use of [Enterprise] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

Id. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

### 4.  The FHFA became the conservator for each Enterprise.

On September 6, 2008, the FHFA placed each Enterprise into conservatorship.  1st Am. Compl. ¶ 7.  The board of directors of each Enterprise consented to the conservatorship.  Id. ¶¶ 7, 87; see also 12 U.S.C. § 4617(a)(3)(I) (permitting the FHFA Director to appoint a conservator when "[t]he [Enterprise], by resolution of its board of directors or its shareholders or members, consents to the appointment").  According to plaintiffs, the consent obtained was invalid due to intimidation and coercion by the FHFA.  1st Am. Compl. ¶¶ 7, 67, 87-101.

### 5.  The FHFA-C contracted with Treasury to obtain funding for the Enterprises.

On September 7, 2008, the FHFA-C entered into a Preferred Stock Purchase Agreement ("PSPA") with Treasury for each Enterprise.  Id. ¶ 68.  Treasury entered into the agreements pursuant to its authority under HERA to buy the Enterprises' securities.  Fairholme II, 147 Fed. Cl. at 17.  The PSPA for each Enterprise is materially identical.  Id.  Under the PSPAs, Treasury committed to provide up to $100 billion to each Enterprise to ensure that the Enterprises maintained a positive net worth.  Id.; 1st Am. Compl. ¶ 69.  If an Enterprise's liabilities exceeded its assets, then the Enterprise could draw on Treasury's funding commitment in an amount equal to the difference between the Enterprise's liabilities and assets.  Fairholme II, 147 Fed. Cl. at 17.

In return for Treasury's funding commitment, the Enterprises surrendered stock, dividends, commitment fees, and control.  First, with respect to the stock, Treasury acquired one-million shares of preferred stock in each Enterprise and warrants to purchase 79.9% of their

respective common stock at a nominal price.  Id.  Treasury's preferred stock had an initial liquidation preference of $1 billion, but the amount increased dollar-for-dollar when an Enterprise drew on Treasury's funding commitment.  Id.  In the event of a liquidation, Treasury was entitled to recover the full liquidation value of its shares before any other shareholder would receive compensation.  Id.  Second, Treasury bargained for the right to a quarterly cash dividend equal to 10% of its liquidation preference.  Id.  An Enterprise that decided against paying a cash dividend in a specific quarter could make an in-kind payment:  the value of the dividend would be added to the liquidation preference, and the dividend rate would increase to 12%.  Id.  Those in-kind payments, however, did not count as a draw from Treasury's funding commitment.  Id. at 18.  Third, Treasury received the right to a quarterly commitment fee from each Enterprise, but Treasury could waive the fee each year.  Id.  If Treasury did not waive the fee, the Enterprise could elect to pay the amount in cash or make an in-kind payment by increasing the liquidation preference.  Id.  Fourth, Treasury obtained de facto control over various aspects of each Enterprise; the Enterprises needed to obtain Treasury's consent before awarding dividends, issuing stock, transferring assets, incurring certain types of debt, and making certain organizational changes.  Id.

The FHFA-C and Treasury amended each Enterprise's PSPA in May 2009, to increase Treasury's funding commitment to each Enterprise from $100 billion to $200 billion.  1st Am. Compl. ¶ 74.  On December 24, 2009, the FHFA-C and Treasury executed another amendment to the PSPAs; they abolished the specific dollar cap and replaced it with a formula to allow Treasury's total commitment to each Enterprise to exceed $200 billion.  Id. ¶ 75; Fairholme II, 147 Fed. Cl. at 18.

On August 17, 2012, Treasury and the FHFA-C executed the third amendment to each PSPA ("PSPA Amendment").  1st Am. Compl. ¶ 76; Fairholme II, 147 Fed. Cl. at 19.  A key component of the amended PSPAs is the requirement—referred to as the "Net Worth Sweep"—that each Enterprise pay Treasury a quarterly dividend equal to 100% of each Enterprise's net worth (except for a small capital reserve amount) rather than a dividend based on a set percentage of the liquidation preference.[5]  1st Am. Compl. ¶ 204; Fairholme II, 147 Fed. Cl. at 19.  Additionally, under the amended PSPAs, the Enterprises are not obligated to pay a periodic commitment fee.  Fairholme II, 147 Fed. Cl. at 19.  Through the conservatorships and the PSPAs, plaintiffs allege that the United States has expropriated all of their economic interests in Fannie and Freddie stock, along with any other property rights they had in their stock.  See 1st Am. Compl. ¶¶ 15, 172, 177, 182-186, 192, 201, 203-205, 220, 222, 225.

**B. Plaintiffs own Fannie and/or Freddie stock.**

There are three named plaintiffs in this putative class action.  "Washington Federal is a subsidiary of Washington Federal, Inc., and is headquartered in Seattle, Washington."  Id. ¶ 17.  Washington Federal and Michael McCredy Baker, another named plaintiff, owned preferred

---

[5]  The capital reserve for each Enterprise started at $3 billion and was set to decrease to $0 by January 2018, but the Enterprises and Treasury agreed in December 2017 to reset the capital reserve amount to $3 billion in the first quarter of 2018.  Fairholme II, 147 Fed. Cl. at 19 n.5.

stock in Fannie and Freddie at the time of the alleged taking/illegal exaction.  Id. ¶¶ 17-18.  The third named plaintiff is the City of Austin Police Retirement System, which owned common stock in Fannie and Freddie at the time of the alleged taking/illegal exaction.  Id. ¶ 19.

Plaintiffs assert that there are four categories of class action plaintiffs encompassed in this suit.  The four classes are holders of (1) Fannie common stock, (2) Freddie common stock, (3) Fannie preferred stock, and (4) Freddie preferred stock, who owned their stock on or before September 5, 2008.  Id. ¶ 209.  The United States is excluded from each class.  Id.

## II. PROCEDURAL HISTORY

Plaintiffs filed their class action complaint on June 10, 2013.  After jurisdictional discovery proceeded in Fairholme, a related case, see supra note 1, plaintiffs filed their first amended complaint on March 8, 2018.[6]  In their amended complaint, plaintiffs plead two direct claims brought in their individual capacities as shareholders.

Plaintiffs first assert that the imposition of the conservatorships on the Enterprises constitutes a Fifth Amendment taking (count I) of their property rights in their stock.  Plaintiffs further assert, in the alternative, that the imposition of the conservatorships constitutes an illegal exaction of their economic interests in their stock (also in count I).  Although plaintiffs' decision to combine two alternative legal claims in the sole count of their amended complaint effectively obscures the delineation of these claims, the amended complaint supplies sufficient clarity for the resolution of the motion pending before the court.

On October 1, 2018, defendant moved to dismiss—in a single, omnibus motion—the claims in this case and eleven related cases before the undersigned.[7]  The plaintiffs in each of the twelve cases filed a response brief on their respective dockets; although some of the plaintiffs relied on a joint brief, plaintiffs here filed a brief that stood alone.  Defendant filed its omnibus reply brief in each of the cases on May 6, 2019.  The parties have fully briefed defendant's motion, and the court held a single oral argument on November 19, 2019, involving the plaintiffs from each of the twelve cases that defendant moved to dismiss.  The plaintiffs in those cases collaborated during argument; each plaintiff argued some of the issues.  Thus, the court infers that the plaintiffs in this case have adopted the favorable arguments made by the plaintiffs in the

---

[6]  A fuller recitation of the procedural history of this case and related cases is provided in Fairholme II, 147 Fed. Cl. at 21-23.

[7]  The eleven related cases are Fairholme Funds, Inc. v. United States, No. 13-465C; Cacciapalle v. United States, No. 13-466C; Fisher v. United States, No. 13-608C; Arrowood Indemnity Company v. United States, No. 13-698C; Reid v. United States, No. 14-152C; Rafter v. United States, No. 14-740C; Owl Creek Asia I, L.P. v. United States, No. 18-281C; Akanthos Opportunity Master Fund, L.P. v. United States, No. 18-369C; Appaloosa Investment Limited Partnership I v. United States, No. 18-370C; CSS, LLC v. United States, No. 18-371C; and Mason Capital L.P. v. United States, No. 18-529C.

related cases to the extent that such arguments are relevant.[8]  Defendant's motion to dismiss is now ripe for adjudication.

## III.  STANDARD OF REVIEW

In ruling on a motion to dismiss a complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), the court generally assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor.  Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  With respect to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction.  Id.  The allegations in the complaint must include "the facts essential to show jurisdiction."  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936).  And, if such jurisdictional facts are challenged in a motion to dismiss, the plaintiff "must support them by competent proof."  Id.; accord Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, . . . the court may inquire by affidavits or otherwise, into the facts as they exist." (citations omitted)).  If the court finds that it lacks subject-matter jurisdiction, it must, pursuant to RCFC 12(h)(3), dismiss the complaint.

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief.  Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").  To survive a motion to dismiss under RCFC 12(b)(6), a plaintiff must include in the complaint "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

## IV.  SUBJECT-MATTER JURISDICTION

The court begins with jurisdiction because it is a "threshold matter."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  Subject-matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case."  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a

---

[8]  The court addresses in this opinion some arguments that were made primarily by the plaintiffs in the related cases to provide context for the resolution of defendant's motion to dismiss.  In addition, to the extent that any of plaintiffs' less-developed arguments are not discussed in this opinion, the court found such arguments to be unpersuasive.

case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); accord K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015). Either party, or the court sua sponte, may challenge the court's subject-matter jurisdiction at any time. Arbaugh, 546 U.S. at 506; see also Jeun v. United States, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "may not be inferred, but must be unequivocally expressed." United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). Any such waiver must be narrowly construed. Smith v. Orr, 855 F.2d 1544, 1552 (Fed. Cir. 1988). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2018); White Mountain, 537 U.S. at 472. However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 298 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

Defendant raises two challenges to the court's jurisdiction to entertain plaintiffs' claims. Specifically, defendant argues that 28 U.S.C. § 1491 bars plaintiffs' claims because they sound in tort. Defendant also contends that plaintiffs' challenge to the conservatorships is untimely under HERA. The court addresses each of these issues in turn.[9]

### A. Plaintiffs' takings and illegal-exaction claims do not sound in tort.

Defendant first argues that plaintiffs' Fifth Amendment takings and illegal-exaction claims sound in tort because they are premised on purported misconduct by the United States. Plaintiffs characterize defendant's challenge to their takings and illegal-exaction claims, as contrasted to its challenge to similar claims in the related cases, as untenable, inadequate, perfunctory, and undeveloped. Pls.' Br. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n") 17.

---

[9] In Fairholme II, the court addressed numerous jurisdictional concerns that were not raised or are not implicated in this case. See, e.g., 147 Fed. Cl. at 34-37 (rejecting the contention of a putative intervenor that the Court of Federal Claims lacks jurisdiction to entertain Fifth Amendment takings claims). Of note, the court disagreed with defendant's contention that the actions of the FHFA-C related to the Net Worth Sweep should not be considered to be those of the United States. Id. at 25-34. Here, however, the focus is on the imposition of the conservatorships by the FHFA; there is no dispute that the FHFA is the United States and that plaintiffs' claims are against the United States. See 12 U.S.C. § 4511(a) (establishing the FHFA as an "independent agency of the Federal Government").

The court cannot agree with plaintiffs' characterization of defendant's argument but agrees with plaintiffs that this jurisdictional challenge lacks merit.[10]

When a party pleads the predicates for a takings claim or illegal-exaction claim, the court possesses jurisdiction to entertain such claims. See Hansen v. United States, 65 Fed. Cl. 76, 80-81 (2005) ("[S]o long as there is some material evidence in the record that establishes the predicates for a [claim covered by the Tucker Act,] . . . a plaintiff succeeds in demonstrating subject matter jurisdiction in this court . . . ."). Those claims, at a basic level, are contentions that the government expropriated private property lawfully (takings) or unlawfully (illegal exaction). See Orient Overseas Container Line (UK) Ltd. v. United States, 48 Fed. Cl. 284, 289 (2000) ("Takings claims arise because of a deprivation of property that is authorized by law. Illegal exactions arise when the government requires payment in violation of the Constitution, a statute, or a regulation." (citation omitted)). If a party alleges the necessary predicates for these claims, the court is not deprived of jurisdiction even if the complaint contains allegations that could support a tort claim. See El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1353 (Fed. Cir. 2004) ("That the complaint suggests the United States may have acted tortiously towards the appellants does not remove it from the jurisdiction of the Court of Federal Claims."); Rith Energy, Inc. v. United States, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (explaining that this court has jurisdiction over a takings claim "even if the government's action was subject to legal challenge on some other ground"). Here, plaintiffs plead the predicates for their takings and illegal-exaction claims by alleging, in essence, that they were forced to give their property to the government because of authorized or unlawful government conduct. Therefore, it is of no import to the court's jurisdiction whether plaintiffs have alleged facts that would also support a tort claim.

**B. Plaintiffs' claims were filed within the relevant limitations period.**

Defendant also argues that plaintiffs' challenge to the imposition of the conservatorships is barred by a limitations period set by HERA. This statutory provision permits Fannie or Freddie to challenge a conservatorship within thirty days of its imposition by the FHFA:

---

[10] Plaintiffs argue that defendant, in its omnibus motion to dismiss which focused primarily on the Net Worth Sweep and not on the imposition of the conservatorships, waived, in large part, arguments that would more specifically address the claims in this suit. Pls.' Opp'n 15-18 & n.5. The court disagrees. Plaintiffs' amended complaint contained no statement that the Net Worth Sweep was not a constituent part of the government actions that harmed plaintiffs—indeed, the document gives the opposite impression. See 1st Am. Compl. ¶¶ 15, 172-186, 204-205, 220, 222, 225. Even plaintiffs' opposition brief, while announcing that the only government action challenged in this suit is the imposition of the conservatorships in 2008, Pls.' Opp'n 3, continues to reference the deleterious effects of the Net Worth Sweep as support for plaintiffs' claims, id. at 13-14. Because plaintiffs continued to clarify, in their briefs and at oral argument, their focus on the imposition of the conservatorships as the basis of their claims, defendant did not waive any arguments against plaintiffs' claims by concentrating on the Net Worth Sweep.

> If the [FHFA] is appointed conservator or receiver under this section, the
> regulated entity may, within 30 days of such appointment, bring an action in the
> United States district court for the judicial district in which the home office of
> such regulated entity is located, or in the United States District Court for the
> District of Columbia, for an order requiring the [FHFA] to remove itself as
> conservator or receiver.

12 U.S.C. § 4617(a)(5)(A).  Plaintiffs argue that HERA does not deprive this court of jurisdiction over their takings and illegal-exaction claims.  The court agrees with plaintiffs.

The court observes, first, that recent precedent from the United States Supreme Court employs a "more stringent test for determining when statutory time limits are jurisdictional." Ford Motor Co. v. United States, 811 F.3d 1371, 1376 (Fed. Cir. 2016) (citing United States v. Wong, 575 U.S. 402, 409-12 (2015)).  Not only has defendant failed to muster any case law showing that this HERA limitations provision applies to plaintiffs' takings and illegal-exaction claims, defendant has not provided any authority to support the proposition that this HERA provision is a jurisdictional bar, rather than a procedural rule.[11]  See Wong, 575 U.S. at 410 (noting that most limitations periods should be presumed to be procedural, not jurisdictional, absent clear indicia to the contrary).  The court finds no jurisdictional bar in HERA that deprives this court of jurisdiction over plaintiffs' claims.

This suit was filed on June 10, 2013.  Plaintiffs' claims focus on the imposition of the conservatorships on September 6, 2008.  The applicable statute of limitations is six years.  28 U.S.C. § 2501.  As a question of jurisdiction, the court finds that plaintiffs' claims are timely.

## V. STANDING

In addition to asserting that the court lacks subject-matter jurisdiction to entertain plaintiffs' claims, defendant challenges plaintiffs' standing to pursue their claims.  A plaintiff bears the burden of demonstrating that it has standing for each claim.  Starr Int'l Co. v. United States, 856 F.3d 953, 964 (Fed. Cir. 2017).  It must establish, among other things, that it is "assert[ing its] own legal rights and interests, and cannot rest [its] claim[s] to relief on the legal

---

[11]   Defendant's reference to a discussion of HERA's limitations provision in Perry II, 864 F.3d at 614, is unpersuasive.  In the court's view, those comments are dicta that expressly do not address "constitutional claims" and, in any case, do not clearly state that HERA's thirty-day limitations provision is jurisdictional.  Id.  The other passages in the decisions relied upon by defendant also do not address the timeliness of a shareholder's takings or illegal-exaction claim founded on the imposition of a conservatorship.  See Gibson v. Resolution Tr. Corp., 51 F.3d 1016, 1020, 1026-27 (11th Cir. 1995) (affirming the dismissal of claims for declaratory and injunctive relief against the conservator of a bank, holding that the plaintiffs could not challenge the validity of the conservatorship pursuant to a provision similar to HERA's thirty-day limitations period); Resolution Tr. Corp. ex rel. First La. Fed. Sav. Bank v. Commerce Partners, 132 F.R.D. 443, 445-47 (W.D. La. 1990) (resolving a discovery dispute, holding that the parties defending against a suit by the conservator of a bank could not challenge the validity of the conservatorship pursuant to a provision similar to HERA's thirty-day limitations period).

rights or interests of third parties." Kowalski v. Tesmer, 543 U.S. 125, 129 (2004). Further, the label assigned to a claim is irrelevant; it is the substance of the allegations that controls. See Allen v. Wright, 468 U.S. 737, 752 (1984) ("[T]he standing inquiry requires careful examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claim asserted."), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). Thus, in a suit brought by shareholders, it is the substance of the allegations and not the label assigned to the allegations—i.e., direct or derivative—that matters. See Starr, 856 F.3d at 966-67; see also In re Sunrise Sec. Litig., 916 F.2d 874, 882 (3d Cir. 1990) ("Whether a claim is [direct] or derivative is determined from the body of the complaint rather than from the label employed by the parties."). A shareholder lacks standing to litigate nominally direct claims that are substantively derivative in nature because its personal request for relief would be based on the rights of the company. See Starr, 856 F.3d at 966-67; see also Weir v. Stagg, No. 09-21745-CIV, 2011 WL 13174531, at *9 (S.D. Fla. Feb. 7, 2011) ("Shareholders do not have standing to bring a direct action for injuries suffered by a corporation, but rather, must bring a derivative action."). A shareholder, therefore, must establish that the claims it labeled as direct are substantively direct in nature—i.e., premised on its injuries rather than the corporation's injuries—to have standing to litigate those claims. See Starr, 856 F.3d at 966-67.

Defendant argues that plaintiffs lack standing because their claims, pled as direct claims, actually belong to the Enterprises and are therefore derivative in nature. The parties in this case and the related cases fully briefed and argued this issue prior to the court issuing the Fairholme II decision. The court concluded in Fairholme II that Fannie and Freddie shareholders lack standing to pursue direct claims that are derivative in nature.

Thereafter, the court solicited short supplemental briefs from plaintiffs and defendant regarding the applicability of the holdings in Fairholme II to this case. In their supplemental brief, plaintiffs suggest that their allegations in support of the claims in the amended complaint, for purposes of establishing standing, are materially different from the allegations regarding the direct takings and illegal-exaction claims asserted in Fairholme. Defendant contends, however, that the differences in the government actions referenced in the two suits does not change the fact that the nature of plaintiffs' alleged injuries is derivative, not direct, as was the case in Fairholme.

### A.  Plaintiffs' allegations of injury are not materially different from the allegations in Fairholme.

Plaintiffs generally contend that their allegations are materially different from those advanced in Fairholme, as regards standing. Plaintiffs point first to the fact that their suit is founded on the imposition of the conservatorships by the FHFA, as contrasted with the Fairholme allegations regarding the Net Worth Sweep effected by the amended PSPAs agreed to by Treasury and the FHFA-C. Pls.' Suppl. Br. on Mot. to Dismiss ("Pls.' Suppl. Br.") 1-2. This suit, therefore, focuses largely on what occurred in September 2008, whereas the related cases, including Fairholme, are focused primarily on what occurred in August 2012. Plaintiffs argue that "[w]hether the Government's unjustified imposition of the conservatorships under HERA harmed shareholders, in the first place, is entirely distinct from [the] FHFA's actions as

conservator related to the [PSPA] Amendment—conduct that was central to finding the claims derivative in <u>Fairholme</u>." Pls.' Suppl. Br. 4. Indeed, plaintiffs suggest that the standing inquiry here is a matter of first impression.

While defendant concedes that the "statutory powers" at issue in <u>Fairholme</u> and this case are different, it asserts that the type of injuries and the claims in the two cases are "virtually identical." Def.'s Resp. to Pls.' Suppl. Br. ("Def.'s Resp.") 1. The court agrees with defendant's statement, at least to the extent that the focus is properly placed on the claims alleged in this suit and in <u>Fairholme</u>, rather than on the fact that plaintiffs here frame their injury as one caused by the imposition of the conservatorships. The standing inquiry is governed more by the true nature of the claim than by distinctions between the relative amount of emphasis that plaintiffs place on certain events occurring in 2008 and the emphasis placed on the Net Worth Sweep in <u>Fairholme</u>.[12] <u>Cf. Katz v. Cisneros</u>, 16 F.3d 1204, 1207 (Fed. Cir. 1994) ("Regardless of the characterization of the case ascribed by [the plaintiff] in its complaint, we look to the true nature of the action in determining the existence or not of jurisdiction." (citing <u>Livingston v. Derwinski</u>, 959 F.2d 224, 225 (Fed. Cir. 1992))). Defendant persuasively argues that the standing inquiry must focus on the nature of plaintiffs' claims, not on the timing of the alleged injury.

It is true, as plaintiffs point out, that some of the facts discussed in <u>Fairholme II</u> are not alleged here. That is because the Net Worth Sweep, as opposed to the imposition of the conservatorships, gives rise to differently articulated claims in the related cases. But these are distinctions without a difference. In all of the related cases presenting direct claims, the takings and illegal-exaction claims have been premised on the expropriation of the plaintiffs' economic interests and property rights as shareholders. Thus, whether the primary focus is on the imposition of the conservatorships or the Net Worth Sweep, the direct takings and illegal-exaction claims are virtually indistinguishable for standing purposes.

Plaintiffs suggest that their injuries are different from those alleged in <u>Fairholme</u>. They state, for example, that "the conservatorships eviscerated Plaintiffs' bundle of property rights in the [Enterprises] overnight." Pls.' Suppl. Br. 3. Plaintiffs also assert that the class members in this suit "sustained billions of dollars in losses." <u>Id.</u> Finally, plaintiffs argue that their situation is not at all like those of the <u>Fairholme</u> plaintiffs, who alleged that their injuries were caused by the overpayments made to Treasury as a consequence of the Net Worth Sweep, because here plaintiffs "focus exclusively on the initial, wrongful government actions, and the direct harm to investors holding shares at that time, from which all subsequent events flowed." <u>Id.</u> at 4.

The court finds no significant distinction, for the standing inquiry, between the alleged injuries here and those in <u>Fairholme</u>. First, although the Net Worth Sweep is less emphasized by plaintiffs, that change to the PSPAs is clearly implicated, as it is in <u>Fairholme</u>, in plaintiffs' claims. <u>See supra</u> note 10. Second, the allegedly "direct" harm to plaintiffs' property interests in their Fannie and Freddie stock is mirrored in the allegations in the <u>Fairholme</u> complaint. <u>See</u> 2d Am. Compl. ¶¶ 169-174, 194-196, 202, <u>Fairholme II</u>, 147 Fed. Cl. at 1 (No. 13-465C). Finally,

---

[12] In addition, plaintiffs' amended complaint relies to a great extent on the Net Worth Sweep to measure the extent of the injuries suffered by the class members. <u>See supra</u> note 10.

for the reasons set forth below, when the test applied in <u>Fairholme II</u> is applied to the amended complaint here, "plaintiffs do not identify an injury unique to them that is independent from any Enterprise injury." Def.'s Resp. 3. Thus, the standing analysis of <u>Fairholme II</u> applies to the claims presented here in the amended complaint.[13]

### B.  Plaintiffs' claims actually belong to the Enterprises.

Having determined that plaintiffs' allegations, for the purposes of the standing inquiry, do not materially differ from those advanced in support of the direct takings and illegal-exaction claims in <u>Fairholme</u>, the court turns to defendant's contention that plaintiffs lack standing to litigate these claims. Defendant's standing argument is premised on its assertion that plaintiffs' claims actually belong to the Enterprises—and are therefore derivative in nature—because, to prevail, plaintiffs would need to establish an injury to the Enterprises and any relief would accrue to the Enterprises. Plaintiffs counter that they assert direct claims and rely on two principal authorities for this proposition: <u>Tooley v. Donaldson, Lufkin & Jenrette, Inc.</u>, 845 A.2d 1031 (Del. 2004) (en banc), and <u>Perry II</u>.

The court observes, first, that federal law governs whether plaintiffs' claims are direct or derivative. <u>See Starr</u>, 856 F.3d at 965. But, as the parties acknowledge, federal law in this area is informed by Delaware law. <u>Id.</u>; <u>see also Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 97 (1991) (noting the "presumption that state law should be incorporated into federal common law"). Under Delaware law, the test for whether a shareholder's claim is derivative or direct depends on the answers to two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" <u>Tooley</u>, 845 A.2d at 1033.

"Normally, claims of corporate overpayment are . . . regarded as derivative [because] . . . the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow." <u>Gentile v. Rossette</u>, 906 A.2d 91, 99 (Del. 2006), <u>discussed in Starr</u>, 856 F.3d at 965. Such claims are derivative even "though the overpayment may diminish the value of the corporation's stock or deplete corporate assets that might otherwise be used to benefit the stockholders, such as through a dividend." <u>Protas v. Cavanagh</u>, No. CIV.A. 6555-VCG, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012); <u>see also Hometown Fin. Inc. v. United States</u>, 56

---

[13]  Section V.B, <u>infra</u>, is a version of the standing analysis in Section V.B of <u>Fairholme II</u>, 147 Fed. Cl. at 45-47, which has been modified to take into account plaintiffs' arguments that were timely raised. Any new arguments raised in plaintiffs' supplemental brief are untimely and waived. <u>See United States v. Ford Motor Co.</u>, 463 F.3d 1267, 1276-77 (Fed. Cir. 2006) (explaining that "[a]rguments raised for the first time in a reply brief are not properly before this court" (citing <u>Novosteel SA v. United States</u>, 284 F.3d 1261, 1274 (Fed. Cir. 2002); <u>United States v. Nealy</u>, 232 F.3d 825, 830-31 (11th Cir. 2000))); <u>Ironclad/EEI v. United States</u>, 78 Fed. Cl. 351, 358 (2007) (noting that "under the law of this circuit, arguments not presented in a party's principal brief to the court are typically deemed to have been waived"). The court did not invite plaintiffs, after the status conference held March 5, 2020, to challenge the standing analysis presented in <u>Fairholme II</u>. <u>See</u> Order of March 19, 2020, at 2 n.2.

Fed. Cl. 477, 486 (2003) ("[C]ourts have consistently held that shareholders lack standing to bring cases on their own behalf where their losses from the alleged injury to the corporation amount to nothing more than a diminution in stock value or a loss of dividends."). Plaintiffs argue that their claims differ from corporate overpayment claims because, in their terms, "the jarring decline in the [Enterprises'] aggregate value resulting from the governmental seizure is most reasonably viewed as the damages suffered by shareholders due to the loss of their rights in the [Enterprises']." Pls.' Opp'n 22. According to plaintiffs, their "stock lost value because it ceased to represent a significant ownership or economic right in the [Enterprises]." Id.

Despite framing their loss as the loss of ownership rights, plaintiffs also recount in their amended complaint the expropriation of the Enterprises' assets by the FHFA through the conservatorships. See 1st Am. Compl. ¶¶ 7-8, 12, 165, 172, 174-175, 177, 182-185. In the amended complaint, plaintiffs' injuries are attributed to both the imposition of the conservatorships and the Net Worth Sweep. Id. Defendant accurately characterizes these injuries as derivative: "Substantively, plaintiffs' claims are derivative because plaintiffs' alleged injuries exist solely as a result of the Enterprises' alleged injuries: first, from the Enterprises' placement in conservatorship; and second, from the Enterprises' payment of dividends pursuant to the [PSPA Amendments]." Def.'s Reply in Support of its Omnibus Mot. to Dismiss 2.

The gravamen of plaintiffs' takings and the illegal-exaction claims is indistinguishable from an overpayment claim: The FHFA, through the imposition of the conservatorships and subsequent manipulations of the Enterprises, gutted Fannie and Freddie and left nothing for the shareholders. See 1st Am. Compl. ¶ 186. Plaintiffs' claims are substantively derivative in nature because they are premised on allegations that the Enterprises themselves were harmed by the conservatorships.[14] See id. ¶¶ 8-10, 12, 68, 73, 77, 145, 147, 157, 164, 174-177, 182-186, 194-195, 198-201, 204, 222; see also id. ¶ 200 (describing the damage from the imposition of the conservatorships as the "damage to Fannie Mae and Freddie Mac, and, in turn, to their shareholders' interests"). Plaintiffs cannot transform their substantively derivative claims into direct claims by merely alleging that, as a result of the conservatorships, they were deprived of their stockholder rights, such as the rights to receive dividends or liquidation payments, or the right to vote on the management of the Enterprises. The claims remain derivative because plaintiffs' purported "harms are 'merely the unavoidable result . . . of the reduction in the value of the entire corporate entity.'" Protas, 2012 WL 1580969, at *6 (quoting Gentile, 906 A.2d at

---

[14] Plaintiffs would remain unsuccessful if their allegations of improper government conduct were construed to be indicative of some action other than simply a depletion of the Enterprises' assets. Any claims premised on waste and mismanagement are derivative in nature. Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988) (noting that "mismanagement resulting in corporate waste, if proven represents a direct wrong to the corporation . . . [that] is entirely derivative in nature"). Plaintiffs' claims are also derivative in nature to the extent that they are premised on (1) a purported reduction in share price as a consequence of the Enterprises losing assets or (2) the FHFA-C acting unfairly by agreeing to transfer profits pursuant to the PSPA Amendments. See Hometown, 56 Fed. Cl. at 486 (stock prices); In re Straight Path Commc'ns Inc. Consol. S'holder Litig., No. CV 2017-0486-SG, 2017 WL 5565264, at *4 (Del. Ch. Nov. 20, 2017) ("Sale of corporate assets to a controller for an unfair price states perhaps the quintessential derivative claim . . . .").

99); see also Agostino v. Hicks, 845 A.2d 1110, 1122 (Del. Ch. 2004) ("[T]he inquiry should focus on whether an injury is suffered by the shareholder that is not dependent on a prior injury to the corporation."). Because plaintiffs' claims are derivative in nature, under Tooley and Starr, plaintiffs lack standing to pursue those claims on their own behalf.

Turning to plaintiffs' reliance on Perry II, the court considers whether this decision by the United States Court of Appeals for the District of Columbia Circuit supports plaintiffs' standing to assert their claims. The parties acknowledge that Perry II did not address takings and illegal-exaction claims, but plaintiffs attempt to find a parallel between their constitutional claims and the direct contract claims discussed in Perry II. According to defendant, however, the nature of the claims in Perry II is not analogous to the nature of the claims in this case because the contract claims considered to be direct in Perry II were asserted by the shareholders against their contracting partners, the Enterprises. The court agrees with defendant that the standing analysis in Perry II is not sufficiently analogous to the standing inquiry required here—those contract claims could not have been derivative in nature because they were brought against the Enterprises, now under a conservator, not on behalf of the Enterprises. See 864 F.3d at 628 ("These [contract claims] are 'not claims that could plausibly belong to' the [Enterprises] because they assert that the [Enterprises] breached contractual duties owed to the class plaintiffs by virtue of their stock certificates." (quoting Citigroup Inc. v. AHW Inv. P'ship, 140 A.3d 1125, 1138 (Del. 2016) (en banc))). Perry II does not assist plaintiffs in establishing standing for their claims.

In sum, plaintiffs have not shown that they have standing to litigate their claims because they do not, and cannot, demonstrate that those claims are substantively direct claims. Therefore, the court dismisses plaintiffs' nominally direct claims on standing grounds.[15]

## C. Plaintiffs' claims are direct claims, as pled, and cannot be deemed to be derivative claims.

Plaintiffs, while acknowledging that they assert only direct claims,[16] attempt to avoid dismissal of those claims for lack of standing by requesting, in a footnote, that the court permit them to pursue their claims as derivative claims. The entirety of the argument is as follows:

> Even if Plaintiffs' claims were derivative in nature—and they are not—the FHFA's role in imposing the conservatorships and its close work with the Treasury in effecting the Government's goals create a conflict of interest that

---

[15] Because plaintiffs' claims must be dismissed for lack of standing, the court need not reach defendant's remaining arguments that these claims should be dismissed for failure to state a claim upon which relief can be granted.

[16] There is no dispute that the claims plaintiffs assert in their amended complaint are framed as direct claims. For their takings and illegal-exaction claims, plaintiffs emphasize that the harm to plaintiffs is direct. 1st Am. Compl. ¶¶ 224-225; see also Pls.' Opp'n 20-22 & n.7 (arguing that plaintiffs' claims are direct, not derivative). In addition, the relief requested by plaintiffs is for monetary relief payable to them, not to the Enterprises. 1st Am. Compl. 82.

prevents the FHFA from pursuing these claims under the Succession Clause [in HERA]. As such, shareholders should be permitted to pursue these claims even if the Court deems them to be derivative.

Pls.' Opp'n 22 n.7 (citing <u>Delta Sav. Bank v. United States</u>, 265 F.3d 1017 (9th Cir. 2001); <u>First Hartford Corp. Pension Plan & Tr. v. United States</u>, 194 F.3d 1279, 1295 (Fed. Cir. 1999)). Because the <u>First Hartford</u> decision is binding precedent from the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), and the holding in <u>First Hartford</u> was followed by the United States Court of Appeals for the Ninth Circuit in <u>Delta Savings Bank</u>, 265 F.3d at 1022-24, the court focuses on <u>First Hartford</u>.

In <u>First Hartford</u>, the Federal Circuit held that a shareholder of a company could bring a derivative claim, notwithstanding a succession clause, if the company was controlled by an entity with a conflict of interest. 194 F.3d at 1283; <u>accord id.</u> at 1295 (remarking that the purpose of derivative suits was to "permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation"). The court in <u>Fairholme II</u> concluded that, pursuant to <u>First Hartford</u>, the plaintiff who asserted derivative claims in <u>Fairholme</u> had standing to litigate those claims due to the FHFA-C's conflict of interest. 147 Fed. Cl. at 49-51.

If plaintiffs had asserted derivative claims in their amended complaint, the "conflict of interest" holding in <u>First Hartford</u> would have aided plaintiffs in their quest to establish standing. But they did not do so. Thus, their reliance on this holding in <u>First Hartford</u> is misplaced.

As for plaintiffs' suggestion that their direct claims could be deemed derivative, they identify no authority for that recharacterization of their claims, even though they had the opportunity to do so in their opposition brief. The court finds plaintiffs' request to be unsupported by authority and unpersuasive for the purpose of establishing plaintiffs' standing to bring the claims in their amended complaint.[17]

## VI. CONCLUSION

The court must dismiss plaintiffs' claims for lack of standing. It therefore **GRANTS** defendant's motion to dismiss. The clerk is directed to enter judgment accordingly. No costs.

The court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which the parties agree. Then, **by no later than Friday, July 17, 2020**, the parties shall file a joint status report indicating either that no redactions are necessary, or their

---

[17] Derivative takings and illegal-exaction claims brought on behalf of the Enterprises are asserted in some of the related cases, including <u>Fairholme</u>.

agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge